[No. A078565. First Dist., Div. Four. Dec. 3, 1998.]

DAVID P. SUTTON, Plaintiff and Appellant, v.
GOLDEN GATE BRIDGE, HIGHWAY AND TRANSPORTATION
DISTRICT, Defendant and Respondent.

1150

1152

**COUNSEL**

Arnold Laub; William B. Boone; E. Robert Wallach; and Robert G. Dyer for Plaintiff and Appellant.

Hanson, Bridgett, Marcus, Vlahos & Rudy, David J. Miller, John J. Vlahos and David W. Baer for Defendant and Respondent.

**OPINION**

**HANLON, P. J.**—In this personal injury action, David Sutton (appellant) appeals from the summary judgment entered in favor of respondent Golden Gate Bridge, Highway and Transportation District (District). Appellant contends that there are triable issues of fact as to whether the District established the defense of design immunity and whether it was negligent independent of any design defect. We affirm.

### FACTUAL BACKGROUND

At approximately 1:00 p.m. on November 2, 1994, appellant was involved in an automobile accident on the Golden Gate Bridge. At the time of the accident, there were three lanes operating in each the northbound and southbound directions. Appellant was driving in the northbound No. 1 lane (the far left or "fast" lane) when he was hit by a car driven by Sandra Roberts. Roberts was changing lanes from the center lane to the No. 1 lane when her car sideswiped appellant's truck. Appellant's truck skidded to the left, crossed the median and entered the southbound No. 1 lane where it was involved in a head-on collision with a pickup truck driven by Clem Gutierrez. Although the posted speed limit was 45 miles per hour, Roberts admitted that she was traveling between 50 and 60 miles per hour. Appellant averred that he was traveling at a speed of 50 miles per hour but Roberts believed that he was traveling at a speed faster than her own, and the District's accident reconstruction expert declared that appellant was traveling at approximately 70 miles per hour.

Gutierrez was pronounced dead at the scene. Appellant sustained serious injuries including the loss of his right leg below the knee, loss of the fingers on his right hand and extensive third and second degree burns on his body.

Appellant filed a personal injury action against the District. He alleged that the lack of a median barrier on the Golden Gate Bridge constituted a dangerous condition of public property, and that the bridge, as maintained by the District, was a nuisance. The District moved for summary judgment, contending that it was entitled to design immunity under Government Code section 830.6. The trial court granted the motion, finding that design immunity provided the District a complete defense on the issue of whether there was a duty to install a median barrier and that there were no triable issues of fact on the other allegations of the complaint.

## DISCUSSION

### 1. *Collateral Estoppel*

 Preliminarily, we address the District's argument that appellant is collaterally estopped from litigating the issue of the District's liability for the lack of a median barrier on the Golden Gate Bridge. It contends that that issue was litigated and resolved between the parties in the action filed by Gutierrez's heirs—Gutierrez v. Sutton (Super Ct. Marin County, No. 165732).[1] We conclude that collateral estoppel does not apply in this action.

Like appellant, the Gutierrez heirs also filed an action against the District raising the question of the District's liability for the accident on the basis of its failure to erect a median barrier on the Golden Gate Bridge.[2] The District moved for summary judgment in that action, arguing as it does here, that it was entitled to design immunity under Government Code[3] section 830.6 for any automobile accidents that occurred on the Golden Gate Bridge due to the lack of a median barrier. Appellant, who was sued for negligence in that action, was represented by counsel for his insurer. His insurance counsel did not file any formal opposition to the motion. Appellant's counsel in the present action, however, filed a declaration opposing the motion and alerting the court to this action. In that declaration, appellant's counsel asked the court to take judicial notice of certain pleadings and documents on file in the present case and argued that the District should not be entitled to design

---

[1]Respondent did not raise this issue in the trial court because the judgment in Gutierrez was not yet final. This issue is thus properly raised for the first time on appeal. (*Haines* v. *Pigott* (1959) 174 Cal.App.2d 805, 807-808 [345 P.2d 339].)

[2]We grant respondent's request for judicial notice of the documents in the Gutierrez action.

[3]All further statutory references are to the Government Code.

immunity. The District argues that appellant was therefore in privity with the Gutierrez plaintiffs and "sufficiently close" to that litigation to preclude appellant from relitigating the issue in this case.

■ "[A] party will be collaterally estopped from relitigating an issue only if (1) the issue decided in a prior adjudication is identical with that presented in the action in question; *and* (2) there was a final judgment on the merits; *and* (3) the party against whom the plea is asserted was a party or in privity with a party to the prior adjudication." (*Clemmer* v. *Hartford Insurance Co.* (1978) 22 Cal.3d 865, 874 [151 Cal.Rptr. 285, 587 P.2d 1098].) "[C]ollateral estoppel may be applied only if due process requirements are satisfied. [Citations.] In the context of collateral estoppel, due process requires that the party to be estopped must have had an identity or community of interest with, and adequate representation by, the losing party in the first action as well as that the circumstances must have been such that the party to be estopped should reasonably have expected to be bound by the prior adjudication. [Citation.] Thus, in deciding whether to apply collateral estoppel, the court must balance the rights of the party to be estopped against the need for applying collateral estoppel in the particular case, in order to promote judicial economy by minimizing repetitive litigation, to prevent inconsistent judgments which undermine the integrity of the judicial system, or to protect against vexatious litigation." (*Id.* at p. 875.)

■ Here, while there is no question that the issues in the two cases are identical and that there was a final judgment on the merits in *Gutierrez*, the record fails to support the requirement of privity between the parties. ■ Ordinarily, collateral estoppel does not apply against parties who were codefendants in a former action. (*Atherley* v. *MacDonald, Young & Nelson* (1955) 135 Cal.App.2d 383, 385 [287 P.2d 529]; see also 7 Witkin, Cal. Procedure (4th ed. 1997) Judgment, § 389, p. 959.) The rule does not apply, however, where the codefendants were adversaries who opposed and litigated issues adversely to each other. (*Stepan* v. *Garcia* (1974) 43 Cal.App.3d 497, 500 [117 Cal.Rptr. 919]; see also 7 Witkin, Cal. Procedure, *supra*, Judgment, § 391, p. 960.) ■ Here, the record discloses that appellant and the District were adversaries in the Gutierrez action, the District having filed a cross-complaint against appellant.[4] Notwithstanding the adversarial relationship between the parties, we cannot conclude that the prior adjudication was a bar to the present motion because appellant did not have the incentive to litigate the issue in that action.

The District relies on *Columbus Line, Inc.* v. *Gray Line Sight-Seeing Companies Associated, Inc.* (1981) 120 Cal.App.3d 622 [174 Cal.Rptr. 527],

---

[4]The cross-complaint is not a part of the record on appeal.

in arguing that the requirement of privity is met here. In *Columbus*, the plaintiffs were injured in a bus accident. They sued the Gray Line, the bus company, which cross-complained against Columbus, the entity that managed the tour from which the plaintiffs had purchased the bus tickets. (*Id.* at p. 625.) The trial court granted Gray Line's motion for summary judgment on the ground that Gray Line was not negligent toward plaintiffs nor vicariously liable for the negligence of any codefendant. (*Id.* at p. 627.) Gray Line thereafter moved for summary judgment on its cross-complaint against Columbus for equitable indemnity, arguing that it could not be held liable as a concurrent tortfeasor because the trial court had determined that it was not liable to the plaintiffs. (*Ibid.*) The trial court granted the motion and the court of appeal affirmed, holding that Columbus was collaterally estopped from litigating issues concerning Gray Line's liability because those issues were determined in the prior adjudication of the summary judgment on the complaint. (*Id.* at p. 631.) The *Columbus* court held that Columbus was in privity with the plaintiffs because both parties had an interest in establishing Gray Line's liability, Columbus was served with Gray Line's motion for summary judgment against the plaintiffs, and Columbus's attorneys appeared at the hearing on the motion in opposition to it. (*Id.* at pp. 630-631.) The court further held that collateral estoppel applied despite Columbus's failure to file any written opposition to the motion. "[I]t was incumbent on Columbus to protect its own interests by vigorously opposing the motion instead of merely relying on plaintiffs' opposition, for Columbus knew (or should have known) that summary judgment exonerating Gray Line from liability to plaintiffs, if it became final, would preclude any claim of indemnity." (*Id.* at p. 631.)

In *White Motor Corp.* v. *Teresinski* (1989) 214 Cal.App.3d 754, 763 [263 Cal.Rptr. 26], the court distinguished *Columbus* and held that collateral estoppel could not be applied against a defendant auto seller who had an opportunity to oppose the defendant auto manufacturer's motion for summary judgment but had no incentive to do so. There, at the time of the summary judgment, the auto manufacturer had not yet named the auto seller as a cross-defendant in its cross-complaint for equitable indemnity. Thus the auto seller defendant had no reason to anticipate that a successful summary judgment motion by the manufacturer against the plaintiffs would be used as a basis for the manufacturer to seek indemnity from it.

*White* is dispositive of the District's collateral estoppel claim here. As a defendant and cross-defendant in Gutierrez, appellant had no incentive to litigate the summary judgment motion brought by the District. As appellant explains, he was represented by his insurer in Gutierrez and not by his

counsel in the present case. His insurer had no interest in pursuing any claims against the District and hence did not oppose the summary judgment motion and did not appear at the oral argument on the motion. Indeed, from the insurer's perspective, if the District prevailed on the summary judgment motion, there would be no basis for the District to pursue its cross-complaint against appellant. Although Robert Dyer, one of appellant's attorneys in the present case, filed a declaration in opposition to the motion, Dyer noted in his declaration that there were differences in the complaints in both cases and that substantial discovery had been conducted in the present case on the issue of design immunity. Dyer urged the court "to draw no conclusions whatsoever regarding the merits of Mr. Sutton's claim by virtue of the presentation made by attorneys for the survivors of Mr. Gutierrez."[5] The record also discloses that counsel for appellant in the present action was not served with the summary judgment motion. Under these circumstances, it would be a violation of due process to preclude appellant from litigating the issue of whether the District is entitled to design immunity. Appellant was not adequately represented on this issue in the Gutierrez case, had no incentive to litigate the issue in that case and could not reasonably have expected to be bound by that adjudication. As he was not afforded the opportunity for a full and fair adjudication of the issue in Gutierrez, he is not collaterally estopped from litigating the issue here.

## 2. *Design Immunity*

Section 830.6 provides a public entity with an affirmative defense of design immunity in actions arising out of an alleged dangerous condition of public property. (*Higgins* v. *State of California* (1997) 54 Cal.App.4th 177, 184 [62 Cal.Rptr.2d 459].) Pursuant to section 830.6, a state is not liable "for an injury caused by the plan or design of a construction of, or an improvement to, public property where such plan or design has been approved in advance of the construction or improvement by the legislative body of the public entity or by some other body or employee exercising discretionary authority to give such approval or where such plan or design is prepared in conformity with standards previously so approved, if the trial or appellate court determines that there is any substantial evidence upon the basis of which (a) a reasonable public employee could have adopted the plan or

---

[5]Respondent vigorously opposed the court's receipt of the Dyer declaration. It argued that the declaration should be stricken because it was submitted by an attorney who was not an attorney of record in the Gutierrez action, had not been associated with appellant's counsel in the action and had not obtained permission to make any special appearance. Moreover, it argued that the declaration was untimely and that it failed to comply with the local rules. It is ironic that respondent now claims that the Dyer declaration supports its argument that appellant had a full opportunity to litigate the issue in Gutierrez.

design or the standards therefor or (b) a reasonable legislative body or other body or employee could have approved the plan or design or the standards therefor. . . ." (§ 830.6.)

The defense of design immunity " ' "is predicated upon the concept of separation of powers—that is, the judicial branch through court or jury should not review the discretionary decisions of legislative or executive bodies, to avoid the danger of 'impolitic interference with the freedom of decision-making by those public officials in whom the function of making such decisions has been vested.' . . . Additionally, judicial economy under-lies design immunity—forbidding a jury from reweighing the same factors considered by the governmental entity which approve[d] the design. . . ." ' [Citation.]" (*Higgins* v. *State of California, supra,* 54 Cal.App.4th at p. 185.)

"If there is *any substantial evidence* supporting the reasonableness of the approved design, design immunity applies. This is true even though the plaintiffs present evidence of a design defect: 'That a paid expert witness for plaintiff, in hindsight, found . . . the design was defective, does not mean, ipso factor, that the design was unreasonably approved.' (*Ramirez* v. *City of Redondo Beach* (1987) 192 Cal.App.3d 515, 525 [237 Cal.Rptr. 505].) '[A]s long as reasonable minds can differ concerning whether a design should have been approved, then the governmental entity must be granted immu-nity.' (*Ibid.*)" (*Higgins* v. *State of California, supra,* 54 Cal.App.4th at p. 185.)

■ "A public entity claiming design immunity must show the existence of three elements, ' "(1) [a] causal relationship between the plan and the accident; (2) discretionary approval of the plan prior to construction; [and] (3) substantial evidence supporting the reasonableness of the design." ' " (*Grenier* v. *City of Irwindale* (1997) 57 Cal.App.4th 931, 939 [67 Cal.Rptr.2d 454].)

■ Appellant challenges each element of design immunity.[6] First, he contends that there was no design decision or plan to omit a median barrier but that the accident was caused by negligent maintenance of the bridge.

___

[6]Appellant correctly points out that the District has the burden of establishing the defense of design immunity. (*Mozzetti* v. *City of Brisbane* (1977) 67 Cal.App.3d 565, 574 [136 Cal.Rptr. 751].) On summary judgment, however, while the moving party has the initial burden to demonstrate that one or more elements of a cause of action cannot be established, or that there is a complete defense to the cause of action, once the moving party so demonstrates, the burden shifts to the opposing party to show that a triable issue of fact remains in the cause of action. (*Villa* v. *McFerren* (1995) 35 Cal.App.4th 733, 743-745 [41 Cal.Rptr.2d 719].) In this case, we must determine whether the District has met its burden of establishing all of the elements of the defense of design immunity.

Relying on *Levin v. State of California* (1983) 146 Cal.App.3d 410, 418 [194 Cal.Rptr. 223], he argues that the District can not establish the first two elements of the defense of design immunity because the defense "does not exist to immunize decisions that have not been made." The *Levin* court determined that there were triable issues of fact as to the design immunity defense. (*Id.* at p. 414.) There, the court found a causal relationship between the design of the highway—the absence of a median barrier and guard rails—and the accident. (*Id.* at p. 417.) The court further concluded that there had been no informed exercise of discretion to approve the plan because the state did not show if consideration was given to its own standards requiring guardrails. (*Levin, supra,* at p. 418.) Finally, the court held the state failed to show substantial evidence of the reasonableness of the design. (*Ibid.*)

Here, the record rebuts appellant's argument that a decision was never made to omit a median barrier. The design decision at issue occurred during the Bridge Deck Replacement Project in 1979 (Project). That Project was undertaken to replace the roadway or deck of the Golden Gate Bridge, which was deteriorating. To assess the traffic safety and traffic flow efficiency considerations of the Project, the District retained Barnard C. Johnson, a consulting traffic and transportation engineer specializing in traffic operations and safety. Johnson conducted a safety study of certain roadway design elements in connection with the Project. As relevant here, that study included an assessment of the feasibility and desirability of installing a median barrier as part of the Project. Johnson concluded that a median barrier should not be installed on the bridge due to "reasons of operational efficiency and safety on the Bridge and throughout the U.S. 101 corridor."[7] He urged that "[t]he present operation of reversing traffic lanes with pylons mounted in the roadway should be continued with emphasis on providing buffer lanes whenever traffic volumes will permit."

Based upon its review of the Johnson study, the District's board of directors voted unanimously on November 9, 1979, to authorize a design for the Project that did not include a median barrier. The District thereafter approved plans and specifications for the Project that did not include a median barrier. The Project entailed complete replacement of the bridge deck surface including the roadway and the sidewalks. After the contract for the Project was approved, it was modified to provide for expansion joints

---

[7] In particular, Johnson noted the increase in congestion that would result from the use of a median barrier which would limit the traffic flow to three lanes in each direction. Johnson concluded that the peak period of capacity on the bridge would be extended from 1 to 3 hours, that 2,550 vehicles would be delayed for over 30 minutes during the morning peak period, resulting in a backup extending over 4 miles north on Highway 101. Johnson opined that the increase in congestion could result in a 30 percent increase in the accident rate.

between the deck sections to accommodate the future installation of cable raceways that would be necessary for a movable median barrier. While work on the Project commenced, the District reviewed and considered proposals to install a movable median barrier.

The District subsequently evaluated four movable median barrier systems. It retained the engineering firm of Sverdrup & Parcel to evaluate the feasibility of a median barrier system on the bridge. Sverdrup & Parcel evaluated four median barrier concepts and concluded that while a movable median barrier system could be developed that would eliminate the hazard of crossover accidents on the Golden Gate Bridge, the accident rate would increase by over one-third due to encroachment on substandard lane widths caused by the median barrier placement. Sverdrup & Parcel's report also noted that the barrier would cause a traffic delay of 15 minutes during peak periods and that the barrier was not cost effective. Sverdrup & Parcel therefore concluded that "[f]rom an analytical approach, i.e. adverse traffic impacts, marginal accident cost reductions and low cost-effectiveness, the development of a MMB [movable median barrier] for the Bridge appears unwarranted. . . . [B]ased upon comparisons to AASHTO [American Association of State Highway and Transportation Officials'] selection criteria for barriers, we, as engineers, cannot recommend the use of the MMB on the Bridge."

The District thereafter retained NASA/Ames Research Center in consultation with Lawrence Livermore Laboratories to independently review the Sverdrup & Parcel report. NASA/Ames recommended that the District select a barrier system or systems for detailed analysis and design and that it develop a testing program for the barriers. The District subsequently solicited proposals to evaluate the effects of barrier systems on traffic safety and capacity. On October 12, 1984, the District retained the Traffic Institute of Northwestern University to perform this analysis. On July 30, 1985, the Traffic Institute concluded that a movable median barrier system was inappropriate for the bridge. In particular, the Traffic Institute opined "that the proposed movable median barrier system is a useful device and [we] can foresee numerous important applications which would improve traffic safety and traffic operations. However, due to the unique characteristics and conditions represented by the Golden Gate Bridge and its approaches, and especially because of the restricted sight distance that would result from the installation of such a barrier on the curved approaches, it is our opinion that the proposed movable median barrier would be inappropriate in this application. [¶] *This conclusion is based on a combination of several factors.* The proposed movable median barrier would be effective in eliminating nearly

all cross-over accidents and in reducing the frequency of fatal accidents. However, the frequency of fatal accidents is already quite small and some fatal accidents would be expected to occur even with a barrier in place. The benefits of such reductions in fatal accidents must be balanced against the expected increases in frequency of injury and property-damage accidents which would be expected if a movable median barrier were implemented. We do not believe that the expected increases in injury and property-damage accidents can be justified by the expected reduction in fatal accidents which would occur if the proposed moveable median barrier were implemented."

The construction work on the Project was completed on August 15, 1985. On August 30, 1985, the District, relying on the report by the Traffic Institute, determined that a movable median barrier was inappropriate for the bridge. Given the extensive analysis of median barriers conducted by the District and its reliance on the expert opinions of several traffic and transportation engineers, substantial evidence supports the reasonableness of the District's decision not to install a median barrier as part of the Project. "Generally, a civil engineer's opinion regarding reasonableness is substantial evidence sufficient to satisfy this element." (*Grenier* v. *City of Irwindale, supra,* 57 Cal.App.4th at p. 941.)

Appellant argues that the Project was not relevant to the design of the bridge but simply maintenance of the road. In support of his argument, he relies on the declaration of Thomas G. Schultz, an engineering consultant. Schultz opined that the Project "was primarily for 'Maintenance' and not design. The geometric (visible) and operational (traffic control) features of the bridge were altered only slightly by widening the outside lanes by one foot." This declaration, liberally construed (see *Levin* v. *State of California, supra,* 146 Cal.App.3d at p. 414), however, does not give rise to a triable issue of fact on whether a design decision was made to omit a median barrier. The record contains substantial evidence that a median barrier was contemplated prior to approval of the Project and that a decision was made not to install one. "That a plaintiff's expert may disagree [that a design decision was made] does not create a triable issue of fact." (*Grenier* v. *City of Irwindale, supra,* 57 Cal.App.4th at p. 941.)

Appellant also contends that any design excluding a movable median barrier was unreasonable. He argues that the California Department of Transportation (Caltrans) Traffic Manual requires that median barriers be employed when there is a high number of cross-median accidents, a rate of 0.50 cross-median accidents involving opposing vehicles per mile per year. Here, again, however, appellant's argument is belied by the record.

The Caltrans Traffic Manual does not require that a median barrier be installed but that median barriers be considered and investigated if certain cross-median accident rates are met. Moreover, the record contains substantial evidence that the District relied on expert engineering opinions that a movable median barrier was inappropriate for the bridge. Indeed, Caltrans reviewed the study conducted by the Traffic Institute and agreed with the technical assessment contained in the report. Caltrans "concur[red] with the opinion, as expressed in the report, that the proposed movable median barrier would be inappropriate in this application." In light of this record, the District met its burden of establishing the elements of design immunity. (See *Higgins* v. *State of California*, *supra*, 54 Cal.App.4th at p. 185 ["[i]f there is *any substantial evidence* supporting the reasonableness of the approved design, design immunity applies"].)

Appellant further contends that the "changed conditions" exception to design immunity applies. ▇ He relies on *Baldwin* v. *State of California* (1972) 6 Cal.3d 424, 434 [99 Cal.Rptr. 145, 491 P.2d 1121] where the court held that "design immunity persists only so long as conditions have not changed. . . . Once the entity has notice that the plan or design, under changed physical conditions, has produced a dangerous condition of public property, it must act reasonably to correct or alleviate the hazard."

▇ Appellant argues that the high cross-over accident and fatality rate after the Project was completed constitutes proof that the Project produced a dangerous condition and that any design immunity has expired. This argument is not persuasive. In fact, the record shows that rates of cross-over accidents declined following completion of the Project. Even appellant's expert highway safety engineer acknowledged the decline in cross-over accident rates.

Appellant also argues that technological advances in the development of a movable median barrier constitute evidence of changed physical conditions defeating design immunity. Even if we were to conclude that a technological advancement constitutes a change in physical conditions, here, the record is replete with documentation that there was no change prior to the accident. As the declaration of Daniel E. Mohn, the District's engineer at the time of the accident, makes clear, after the District decided against installing a movable median barrier in 1985, it continued to study the proposals to install movable median barriers. Mohn, however, declared that this review did not alter his conclusion that the proposed barriers would be inappropriate for the bridge. "At no point prior to the date of the subject accident, November 2,

1994, did Barrier Systems, Inc.[8] make any proposal to the District to or actually install any moveable median barrier which was materially different than the proposed barrier which had already been evaluated by Sverdrup & Parcel and the Northwestern University Traffic Institute. In particular, all such barrier[s] were two feet wide and suffered from lateral deflection. Barrier System, Inc.'s proposal to design and construct a prototype one-foot moveable median barrier with a radically redesigned hinge mechanism to limit the barrier['s] lateral deflection was not made until after the subject accident. . . ." Hence, appellant has not shown that a change in technological advances by the time of the accident produced a dangerous condition on the bridge.

Finally, appellant contends that changed physical conditions are unnecessary to the loss of design immunity and that immunity ends when it is apparent that the design has created a dangerous condition. Appellant relies on *Bane* v. *State of California* (1989) 208 Cal.App.3d 860 [256 Cal.Rptr. 468]. In *Bane*, the court held that the 1979 amendment to section 830.6 nullified the *Baldwin* language requiring that a change in physical conditions occur before an approved design may be deemed unreasonable. (208 Cal.App.3d at p. 871.) The court therefore concluded that changed conditions are unnecessary to defeat design immunity but that design immunity is lost once the public entity has notice that the design is unreasonable for any reason and has a sufficient time period to remedy it. (*Ibid.*)

*Bane*, however, incorrectly interprets the 1979 amendment. (See *Grenier* v. *City of Irwindale, supra,* 57 Cal.App.4th at pp. 944-945 and *Compton* v. *City of Santee* (1993) 12 Cal.App.4th 591, 598-599 and fns. 4 and 5 [15 Cal.Rptr.2d 660].) Section 830.6 was amended in 1979 to grant public entities a reasonable time to repair or remedy a dangerous condition of which it has notice: "Notwithstanding notice that constructed or improved public property may no longer be in conformity with a plan or design . . . which reasonably could be approved by the legislative body or other body or employee, the immunity provided by this section shall continue for a reasonable period of time sufficient to permit the public entity to obtain funds for and carry out remedial work necessary to allow such public property to be in conformity with a plan or design approved by the legislative body of the public entity or other body or employee." (Stats. 1979, ch. 481, § 1, p. 1638.) As explained in *Grenier* v. *City of Irwindale, supra,* 57 Cal.App.4th at page 944, "[n]othing in the legislative history of the 1979 amendment reflects an intent to expand *Baldwin* [*Baldwin* v. *State of California, supra,* 6 Cal.3d 424] and provide for the loss of design immunity in a situation other

---

[8]Barrier Systems, Inc., is a developer of movable median barriers.

than changed physical conditions. Instead, a review of the legislative history indicates the amendment was intended to respond to *Baldwin* by providing a reasonable extension of the immunity when, under the holding of *Baldwin*, that immunity otherwise would be lost. (See, e.g., Aug. 30, 1979, letter from Assemblyman John Knox to Governor Brown, regarding Assem. Bill No. 893 (1979-1980 Reg. Sess.) ['Although the staff of the Joint Committee on Tort Liability agreed with *Baldwin*, it felt there should be some recognition of the practical limitations which have been imposed upon governments by Article XIII A of the California Constitution (Proposition 13) and ever increasing liability insurance costs.'].)"

We agree with the *Grenier* and *Compton* courts that changed physical conditions are necessary to the loss of design immunity. As one commentator has noted, the 1979 amendment to section 830.6 "[i]nterpreted literally . . . does not define the circumstances under which the design immunity is lost; rather, it specifies the circumstances under which it may be retained." (Fisher, *Design Immunity for Public Entities* (1991) 28 San Diego L.Rev. 241, 257.) As appellant has not shown a change in physical conditions, there is no triable issue of fact on design immunity.

### 3. *Negligence*

Appellant contends that the District was negligent independent of any design defect. He argues that the District was negligent in not using a buffer lane, that it failed to prohibit lane changes or enforce speed limits and that it failed to give warnings of the special hazards of driving on the bridge such as fog, narrow lanes and the high rate of cross-over accidents.[9]

While design immunity " 'does not immunize [a public entity] from liability caused by negligence . . .' " (*Cameron* v. *State of California* (1972) 7 Cal.3d 318, 328 [102 Cal.Rptr. 305, 497 P.2d 777]), here the District established that its decision not to use a buffer lane at midday, the approximate time of the accident, was part of the design of the Project. As set forth in the declaration of Robert A. Warren, the bridge manager, "in addition to the lack of a median barrier, lane changing and the changing and timing of lane configurations including the lack of buffer lanes at mid-day were all encompassed within the Deck Replacement Project plans approved by the Board."

---

[9]Appellant also challenges the trial court's grant of summary judgment on his nuisance claim. That claim fails because the District established design immunity. (See *Mikkelsen* v. *State of California* (1976) 59 Cal.App.3d 621, 630 [130 Cal.Rptr. 780] ["To permit the effectiveness of the design immunity embodied in Government Code section 830.6 to depend upon whether a cause of action is pleaded on the theory of nuisance or on that of negligence would be to thwart the legislative purpose."]

In addition, as the District points out, it is entitled to immunity for its decision not to prohibit lane changing and any failure to enforce the speed limit. "A public entity is not liable for an injury caused by adopting or failing to adopt an enactment or by failing to enforce any law." (§ 818.2, see *Osgood* v. *County of Shasta* (1975) 50 Cal.App.3d 586, 590 [123 Cal.Rptr. 442] [county was immune from liability for failing to enact or enforce safety regulations regarding water skiing on lake]; see also § 830.4 ["A condition is not a dangerous condition . . . merely because of the failure to provide regulatory traffic control signals, stop signs, yield right-of-way signs, or speed restriction signs . . . ."].) Further, appellant failed to show that an exception to public entity immunity as set forth in section 830.8 for failing to provide warning signals or signs was applicable. Finally, the record also fails to support appellant's argument that warning signs were necessary. The alleged dangers were reasonably apparent and would have been anticipated by a person exercising due care. (See § 830.8; see also *Allyson* v. *Department of Transportation* (1997) 53 Cal.App.4th 1304, 1318 [62 Cal.Rptr.2d 490] [section 831 weather immunity applied where plaintiff failed to offer evidence to rebut showing that snow was reasonably apparent on highway].)

## DISPOSITION

The judgment is affirmed. The District shall recover its costs on appeal.

Reardon, J., and McGuiness, J., concurred.

A petition for a rehearing was denied December 31, 1998, and appellant's petition for review by the Supreme Court was denied March 9, 1999.