[No. A108618. First Dist., Div. One. Apr. 13, 2006.]

SHAWN MOONEY, Plaintiff and Respondent, v.
WILLIAM S. CASPARI et al., Defendants and Appellants.

CountedL

COUNSEL

Horvitz & Levy, John A. Taylor, Jr., Jon B. Eisenberg; Lombardi Loper & Conant and Ralph A. Lombardi for Defendants and Appellants.

Law Office of Robert E. Goldman, Robert E. Goldman; Law Office of Daniel U. Smith and Daniel U. Smith for Plaintiff and Respondent.

OPINION

**SWAGER, J.**—Following a jury trial and verdict, a judgment was entered in the amount of $1.5 million in favor of respondent in his legal malpractice action against appellants. We conclude that respondent's action is barred by a prior judgment in a malpractice action against a party in privity with respondent, and reverse the judgment.

## STATEMENT OF FACTS AND PROCEDURAL HISTORY[1]

The current action—one of several that has resulted from an ill-fated joint venture agreement to develop 12.32 acres of commercial property—had its genesis 25 years ago, when respondent's father, Mike Mooney, a licensed commercial real estate broker doing business as Mike Mooney Associates, entered into a listing agreement with Specialty Restaurants Corporation (Specialty), which owned the property located near the western entrance to the San Mateo/Hayward Bridge on State Route 92 in Foster City (the

---

[1] Some of our recitation of the underlying, undisputed facts will be taken from the prior opinion of this court in *Praxis Development Group, Inc. v. Richman, Lawrence, Greene & Chizever* (July 8, 2005, [nonpub. opn.]) (*Praxis v. Richman*), of which we have taken judicial notice. We have also granted respondent's February 14, 2006 request to lodge the exhibits admitted at trial as part of the record on appeal.

property). Pursuant to the listing agreement, Mike Mooney was given the exclusive right to sell or lease the property for a stated commission of 7 percent. He died before the property was sold or leased. His son, respondent, also a licensed real estate broker, acquired the listing rights to the "Specialty Restaurants land deal" along with his father's business.[2]

On September 4, 1990, Praxis Development Group, Inc. (Praxis), and its principal Dan Levin, entered into a limited partnership agreement with Specialty (the agreement) to form Bridge Landing Associates (BLA).[3] The stated purpose of the agreement was to subdivide, develop and lease the property as an office building complex "for the production of income and profit." Pursuant to the agreement, Specialty contributed to the limited partnership an option for BLA to acquire title to the property.[4] The agreement specified that Praxis assumed the obligation to "undertake to obtain all necessary approvals and financing, and thereafter to own and operate the Project as an investment for the production of income and/or for sale, in whole or in part." Specialty agreed to cooperate with Praxis to subdivide the land and facilitate construction of the office building complex. Once Praxis obtained the permits and secured financing, the agreement contemplated that the partnership would acquire the property from Specialty at a price equal to the fair market value of the land as determined by an appraisal.

The agreement further provided in section 4.03 that "[i]f, twenty-four (24) months following the Agreement Date, there has not occurred a Construction Start Date, the Option shall thereupon expire, unless the delay has resulted from either delays in the public approval process or an inability to obtain a commitment to finance the Project in a manner which would not result in an economic hardship on the Project or would make the Project economically infeasible, in which case the General Partner may extend the Construction Start Date for up to an additional eighteen (18) months. . . ."

When the agreement was executed, the parties anticipated that within six months the California Department of Transportation would obtain approval from Foster City to construct a four-way freeway interchange at or near the

---

[2] Before his father's death, respondent operated a separate residential real estate business.

[3] Praxis was listed in the agreement as the general partner; Specialty was the limited partner.

[4] The agreement defined the option as "the right of the Partnership, created by this Agreement, to require [Specialty], at any time after the first anniversary of the Agreement Date (or sooner, if the Interchange Exchange Agreement is signed sooner), to sell and convey to the Partnership unencumbered fee simple title to the Land, (or to successive Parcels thereof following approval of a subdivision of the Land), subject only to liens and encumbrances approved by Praxis and by any Participant that has issued a Financing Commitment for financing the construction of Improvements on the Land or the relevant portion thereof."

property to connect East Third Avenue to State Route 92, the San Mateo/Hayward Bridge. The negotiation with Foster City of an agreement for construction of the freeway interchange upon "satisfactory terms and conditions" was described as "critical to the success of the Project." Thus, Specialty promised to "use its best efforts" to negotiate and facilitate the contemplated "Interchange Exchange Agreement," and to ensure that Praxis was "not delayed in the approval process for development of the Project." The dates stated in the agreement "regarding the timing of construction" were specified to start only upon "the day the Interchange Agreement is signed."[5]

On July 30, 1993, BLA entered into an "Exclusive Right to Lease Agreement" with respondent, as the successor-in-interest of Mike Mooney Associates, to market the property and find tenants for the office space, with his compensation based upon the structure of any lease he negotiated. In October of 1993, respondent registered Applied Biosystems as a prospective tenant to lease office space in the project, although Applied Biosystems was opposed to the freeway interchange.

After the agreement was executed, Levin repeatedly expressed his understanding to Specialty that the 24-month option period granted to Praxis pursuant to the agreement did not commence until the Interchange Exchange Agreement was executed and the property lines of the project were definitively determined. "Praxis advised Specialty in writing, either explicitly or implicitly, on at least eight occasions from September 1990 through January 1994 that it was waiting for the signing of the Interchange Exchange Agreement prior to commencing the two-year option period during which Praxis would then begin its development work." Specialty was ultimately unable to obtain approval of the Interchange Exchange Agreement by Foster City, and on April 18, 1994, the interchange was deleted from the Foster City general plan.

Despite the disapproval of the freeway interchange, Levin and respondent continued to work with Applied Biosystems to finalize a tenancy agreement.

---

[5] Section 4.04 of the agreement read, in part: "The Partners contemplate that in connection with the planned construction of the Interchange, one or more portions of the Land will be threatened by a taking by one or more Governmental Authorities, and that in lieu of such taking, [Specialty] will use its best efforts [to] negotiate and agree to enter into the Interchange Exchange Agreement. [Specialty] agrees that the negotiation of satisfactory terms and conditions for the Interchange Exchange Agreement and the construction of a full four-way interchange connecting East Third Avenue and Route 92, are critical to the success of the Project. Praxis shall participate in such negotiations, and [Specialty] shall keep Praxis fully informed at all times as to the progress and status of such negotiations. It is anticipated that the Interchange Exchange Agreement will be signed within six (6) months of the signing of this Agreement. It is further agreed that none of the dates referenced in this Agreement regarding the timing of construction will start until the day the Interchange Agreement is signed."

Respondent presented evidence that following the deletion of the Interchange Exchange Agreement from the Foster City general plan, Applied Biosystems remained interested in leasing office space on the property.

Specialty notified Levin by letter dated June 1, 1994, however, that "the option is no longer of any force and effect because it is terminated pursuant to 4.03." Specialty's position in the letter was that the two-year option period in favor of BLA expired on March 4, 1994. In the letter Specialty also requested dissolution and liquidation of the BLA partnership. Levin and respondent were also informed by Specialty in August of 1995 to refrain from any further negotiations with Applied Biosystems, or any other activity "regarding the property."

Levin was stunned by the announcement from Specialty of termination of the option, which he considered unfounded and contrary to both the provisions in the agreement for extension of the option period until the Interchange Exchange Agreement was executed, and the position previously taken by Specialty. Following Specialty's assertion that the option had expired and the partnership was terminated, Praxis and Mooney were foreclosed from proceeding with the development of the property.

As part of its previously initiated Chapter 11 bankruptcy proceeding, in May of 1995 Specialty filed an "adversary action" against Praxis to dissolve the BLA partnership and quiet title to the property (*Specialty v. Praxis*). Levin retained attorney Kenneth Greene to represent Praxis in the bankruptcy action.[6] Levin testified that he did not engage Greene to represent respondent's interests in *Specialty v. Praxis,* but rather only to pursue the rights of BLA under the agreement. Levin was aware, however, that the interests of respondent and Praxis in the litigation were "intertwined, because if the BLA partnership goes forward and BLA actually gets the land and pays for the land, then the commission is paid to Shawn Mooney."

Respondent also realized that he "had a vested interest" in the success of Praxis/BLA in *Specialty v. Praxis*. Due to respondent's commission agreement with BLA, his "rights were derivative of Praxis' rights" in the litigation. Thus, he not only actively assisted Greene in the presentation of Praxis's claims, but simultaneously retained Greene to file two separate claims in the

---

[6] Greene was then affiliated with the law firm of Keck, Mahin & Cate, but resigned in November of 1995 and became counsel to the law firm of Richman, Lawrence, Greene, & Chizever (the Richman law firm), although he continued his representation of Praxis in *Specialty v. Praxis*. All the files in the case were transferred with Greene to the Richman law firm.

bankruptcy proceeding (*Mooney v. Specialty*): one based on his commission agreement with BLA, the other based on his father's contract with Specialty.

The *Specialty v. Praxis* action was tried first. Respondent knew that if BLA was successful with the assertion that the option had not expired the project would proceed and he would not need to pursue his claims. Respondent assisted Greene by "gathering facts and information about the litigation." He also explained to Greene that the case on his "behalf was the same for the Praxis claim." Mooney was "present at the counsel table helping out with the case" during the trial and pretrial proceedings in *Specialty v. Praxis*. Levin considered Mooney to be a "very good source of information about what was going on and what had transpired."

Following two days of trial of the Praxis adversary action in *Specialty v. Praxis*, the United States Bankruptcy Court for the Central District of California issued its decision (*In re Specialty Restaurants Corporation*, No. SV93-41032-KL) on May 1, 1996. The court concluded that the agreement was silent on the effect of the deletion of the Interchange Exchange Agreement upon the commencement of the option period, but the reasonable intent of the parties was that the two-year period was to run from the date the Interchange Exchange Agreement was deleted from the Foster City general plan on April 18, 1994, and therefore expired on April 18, 1996. The court rejected Praxis's claim that the time should be tolled during the pendency of the adversary action. The court further found the freeway interchange was essential to the success of the proposed project, and the deletion of it from the Foster City general plan rendered the agreement "impossible to perform" by Praxis given the infeasibility of a more modest mid-rise office building development. The court concluded that "Praxis was under an affirmative duty to protect its rights, and not only failed to file suit for declaratory relief, but also failed to file a counterclaim in these proceedings making the assertion." The bankruptcy court therefore dissolved the partnership and granted Specialty's request to quiet title to the property.

When the bankruptcy court's decision against Praxis and Levin was issued, respondent was very concerned that his "derivative" rights were "likely to go down with them" in *Mooney v. Specialty*, which was still pending before the "same judge." Respondent also felt that the unsuccessful *Specialty v. Praxis* litigation was the fault of Greene.

Respondent's remaining creditor's claims against Specialty for breach of the implied covenant of good faith and fair dealing, and tortious interference with an existing contract (*Mooney v. Specialty*) were resolved following trial before the bankruptcy court in October of 1998. The court found that

Specialty did not breach the implied covenant of good faith and fair dealing by repudiating the joint venture agreement, and did not breach its contract with respondent.

Levin retained Bill Caspari of the law firm of Boli and Caspari to pursue an appeal of the bankruptcy court's decision in *Specialty v. Praxis*.[7] The appeal was taken by Praxis to the United States District Court of the Central District of California. Respondent and Levin also planned to have Caspari file an action for legal malpractice against Greene and the Richman law firm in the event the appeal was unsuccessful. Respondent assisted Caspari with the appeal and the preparation of the contemplated malpractice suit.

However, Caspari advised respondent that until the bankruptcy court decision was final no damages had been suffered as a result of any malpractice by Greene. In a conversation with respondent in August of 1998, Caspari stated that "if and when it became necessary to do so," he would file a malpractice action against Greene and the Richman law firm on respondent's behalf. The strategy explained to respondent by Caspari was to await the decision on appeal in *Specialty v. Praxis*: if Praxis won, they would all "collect from Specialty" as the party primarily at fault; if Praxis lost, the malpractice case against Greene would need to be filed within one year thereafter—February 4, 2000, at the earliest—so "there was still plenty of time to do it."

Caspari did file an appeal for respondent from the adverse decision of the bankruptcy court in *Mooney v. Specialty*, principally to delay the outcome of that case while *Specialty v. Praxis* was pending. Caspari felt that the two cases were entirely interconnected, and the "Praxis appeal" was chronologically advanced, so awaiting that decision was appropriate.

In a memorandum order—*In re Specialty Restaurants Corporation; Praxis Development Group v. Specialty Restaurants Corp.*—filed on January 12, 2000, the district court affirmed the bankruptcy court judgment, with the explanation: "[P]raxis frames the issue for the court to consider as whether Praxis lost it[s] rights in the property by failing to file an affirmative claim. However, Praxis lost its rights in the property because the bankruptcy court found that the option had been neither exercised nor extended by April 18, 1996. In other words, Praxis lost its rights in the property not because it failed to file an affirmative claim, but because the evidence presented to the bankruptcy court did not show that it continued to have any rights in the property." (*Praxis Development Group v. Specialty Restaurants Corp.*

---

[7] We will refer to Bill Caspari and the Law Office of Boli & Caspari collectively as appellants; we will refer to Bill Caspari individually as Caspari.

(C.D.Cal. Jan. 12, 2000, No. CV96-08246) [2000 WL 34005668, p. *6, affd. 21 Fed.Appx. 707 (9th Cir. 2001)].) The court concluded that the "bankruptcy court was correct to rule on the purpose of the agreement and its continuing viability, and did not commit clear error in finding the purpose was no longer feasible. The bankruptcy court correctly did not reach the issue of the tolling of the option period, as Praxis had not raised the issue prior to the close of trial. . . . Finally, the record shows that Praxis did not pursue its breach of contract claim before the bankruptcy court. By not doing so, it has abandoned any such claim. Accordingly, the judgment of the bankruptcy court is AFFIRMED." (*Ibid.*)

An appeal was taken by Praxis to the Ninth Circuit, which filed its memorandum opinion—*In Re Specialty Restaurants Corporation*, No. 00-55327—on October 30, 2001. The Ninth Circuit held that Praxis's claims had not been "delineated in its answer or preserved in the pretrial conference order." (*In re Specialty Restaurants Corp.* (9th Cir. 2001) 21 Fed.Appx. 707.) Therefore, the claims would not be considered on appeal, and the bankruptcy court did not err. (*Id.* at p. 708.)

Once the circuit court opinion was filed, Praxis and Levin, represented by appellants, initiated a lawsuit for legal malpractice against Greene and the Richman law firm (*Praxis v. Richman*) on January 31, 2002, which alleged that Greene provided negligent representation in the *Specialty v. Praxis* litigation. Numerous claims of deficient performance by Greene were presented: that he failed to file a claim for affirmative relief in the adversary action; he failed to file any other affirmative claim against Specialty on behalf of Praxis; he failed to preserve Praxis's affirmative claims at the issue conference held in the adversary action; he failed to advise Levin and Praxis that Specialty's actions had triggered the two-year option period; he failed to advise Levin and Praxis to file an affirmative claim against Specialty; and he failed to advise Levin and Praxis that the option period began in April 1994, or at any time during the pendency of the litigation. As a result of Green's negligence, Praxis and Levin claimed damages that included profits they "reasonably would have enjoyed had they been able to enforce the Limited Partnership Agreement against Specialty and develop the property which was the subject of the Limited Partnership Agreement."

Caspari did not file a malpractice action for respondent against Greene and the Richman law firm. By August of 1999, Caspari perceived a conflict of interest due to his representation of Praxis in its potential $6 million action based upon Greene's malpractice, and the "limited pool of assets" available for collection of a judgment. He was also concerned with the dubious prospects of success in respondent's malpractice case against Greene and the Richman law firm, particularly with the issue of respondent's damages in the "underlying case" involving Specialty. Caspari, however, did not advise

respondent that he "had a conflict of interest" until February of 2000. Caspari testified that he did not discuss the malpractice case with respondent before then, but if respondent had asked he "would have sent him a letter advising him that [he] was not going to represent him." On February 11, 2000, Caspari sent a letter to respondent in which he stated: "Unfortunately, our office will not be able to represent you in connection with an action against Mr. Greene due to our representation of Praxis."

Respondent adduced evidence that as the February 4, 2000, deadline to file his malpractice case drew near, he repeatedly attempted to contact Caspari to discuss the impending statute of limitations, but received no response. According to respondent, before the letter dated February 11, 2000, Caspari did not advise him of a conflict of interest or recommend that he "seek other counsel for a malpractice case."

After the statute of limitations for respondent's malpractice case against Greene lapsed, respondent separately filed the present action against appellants for legal malpractice on February 6, 2001. As amended, the complaint essentially alleged dual levels of legal malpractice: first, by Greene in *Specialty v. Praxis* in failing to properly raise the issue of the tolling of the two-year option period, which would have given BLA the right to exercise the option to purchase the property and lease office space to Applied Biosystems; and then, by Caspari in failing to file a malpractice action against Greene before the statute of limitations expired. As damages resulting from Caspari's negligence, respondent further alleged that upon rental of office space by Applied Biosystems from BLA he would have received compensation pursuant to his two listing agreements.

Once the appeals in *Specialty v. Praxis* were concluded, the *Praxis v. Richman* case proceeded with a motion for summary judgment by the defendant Richman law firm. Following a hearing on the motion the trial court found "that there is no issue of material fact in .this action and that defendant is entitled to summary judgment as a matter of law." The court determined that Levin had "no standing to sue in his own right and legal malpractice claims are not assignable." As to Praxis, the court found "as a matter of law that Paragraph 4.03 of the Partnership Agreement between Praxis and Specialty Restaurant Corporation defined the circumstances in which the two years allowed for Praxis's performance could be extended. These related to delays in public approvals and financing. Litigation was not one of them. The construction start date was not delayed in the manner provided for by the contract, and thus the condition precedent for an extension of the Partnership Agreement did not exist. Thus, it made no difference whether attorney Kenneth Greene presented a claim for affirmative relief since Specialty's filing of the litigation would have been no ground to

excuse performance and would give no basis for an extension." The court further found "that the failure to file a counterclaim for affirmative relief did not cause the option to expire. The option expired because the construction start date did not occur. Moreover, filing a counterclaim for affirmative relief would not have changed the facts that the construction start date did not occur and that the prerequisites to Praxis being able to extend the option did not occur. A lawyer has no obligation to allege an unmeritorious claim or to advise a client on an unmeritorious claim." The court entered judgment in favor of the Richman law firm on September 30, 2003. Praxis filed a timely notice of appeal.

The judgment in *Praxis v. Richman* was affirmed on appeal in an opinion filed on July 8, 2005 (A104874; see fn. 1, *ante*). Despite the undisputed facts that Specialty never performed and Greene did not file any claims against Specialty, two essential elements of a cause of action for legal malpractice were found unsubstantiated: damages and causation. The additional undisputed fact, "that a condition specified in the agreement, namely, the Interchange Exchange Agreement" also never occurred, was found to excuse Specialty's performance of the agreement based on impossibility. The court pointed out: "Once Foster City deleted the Interchange Exchange Agreement from its general plan, the agreement as contemplated by Specialty and Praxis became impossible to perform or impractical because success of the project depended upon this condition. The parties from the beginning must have known that the agreement could not be fulfilled unless Foster City implemented the Interchange Exchange Agreement." The court thus concluded that "any claims filed by Greene on behalf of Praxis in Specialty's adversary action would have been futile. Accordingly, Praxis cannot establish any injury or damages from Greene's failure to file any claims or advise it that the option would lapse in April 1996."

The court also concluded that the impossibility or impracticality of performance of the joint venture agreement was not due to Greene's failure to plead or claim Specialty's express or implied repudiation of the agreement, but rather due to Foster City's rejection of the Interchange Exchange Agreement that occurred before any failure to perform by Specialty. The court explained that "the parties contracted with the clear intent that Praxis would develop the property and Specialty would sell the property to the partnership once the Interchange Exchange Agreement occurred. Once this critical element failed to occur, performance on the contract was excused. Thus, even if Praxis's option had been tolled or did not expire, performance by Specialty would have been excused under this agreement."

Focusing specifically upon the liability of Greene for malpractice, the court stated: "An attorney is liable for legal malpractice only if his or her failure

results in loss of the client's meritorious claim. (*Loube v. Loube* (1998) 64 Cal.App.4th 421, 426 [74 Cal.Rptr.2d 906], citing *Gutierrez v. Mofid* (1985) 39 Cal.3d 892, 900 [218 Cal.Rptr. 313, 705 P.2d 886].) Thus, if Greene had filed a breach of contract claim or a claim of anticipatory repudiation against Specialty, Praxis would not have been likely to prevail because Specialty was excused from performing based on the affirmative defense of impossibility. Accordingly, Praxis suffered no damages from Greene's failure to act." And in response to Praxis's argument that the project could have proceeded even without the Interchange Exchange Agreement, the court stated: "Praxis's argument, however, misses the pivotal issue: A central assumption of the contract did not occur. Once Specialty was unable to negotiate the Interchange Exchange Agreement, which was necessary for the project to be successful under the express terms of the agreement, Specialty's performance on the contract was excused. Accordingly, Praxis could not succeed in a breach of contract claim or in any other affirmative claims based on Specialty's nonperformance of the contract. Accordingly, the claim of legal malpractice against Greene must fail as a matter of law."

As a "second, independent basis for affirming the trial court's grant of summary judgment against Praxis's claim of legal malpractice" in *Praxis v. Richman*, the court found that "Praxis cannot establish that Greene was the cause of any injury." According to the undisputed evidence, Praxis "lost its rights in the property once the option period expired as specified in the agreement," not because Greene failed to file an affirmative claim that the time for acting on the option agreement was tolled. Consequently, the court concluded, "Greene's failure to file a claim against Specialty in the adversary proceeding was not, as a matter of law, the cause of Praxis's loss of interest in the property or project."

Meanwhile, the present case proceeded to trial in July and August of 2004. The jury returned a special verdict in favor of respondent in the amount of $1.5 million, based upon Caspari's negligent failure to timely file a malpractice action against Greene. This appeal followed.

## DISCUSSION

Appellants have presented numerous issues in this appeal, but we confront and resolve only the first of them: that the present action is "precluded by the collateral estoppel effect of *Praxis v. Richman*." Appellants argue that the final determination in *Praxis v. Richman*, that Greene cannot be liable to Praxis for legal malpractice, bars the present malpractice action which is necessarily based upon the same underlying conduct. Appellants acknowledge that the parties in the two suits are not identical, but claim "there was a privity between Mooney and Praxis," which "makes the relationship between

Mooney and Praxis 'sufficiently close' to justify application of collateral estoppel" and foreclose relitigation of the malpractice issue.

■ We very recently restated the fundamental principles that govern the doctrine of collateral estoppel: "Issue preclusion by collateral estoppel 'prevents "relitigation of issues argued and decided in prior proceedings." [Citation.]' (*Castillo v. City of Los Angeles* (2001) 92 Cal.App.4th 477, 481 [111 Cal.Rptr.2d 870]; see also *Bob Baker Enterprises, Inc. v. Chrysler Corp.* (1994) 30 Cal.App.4th 678, 686 [36 Cal.Rptr.2d 12].) The doctrine 'rests upon the ground that the party to be affected, or some other with whom he is in privity, has litigated, or had an opportunity to litigate the same matter in a former action in a court of competent jurisdiction, and should not be permitted to litigate it again to the harassment and vexation of his opponent. Public policy and the interest of litigants alike require that there be an end to litigation.' (*Panos v. Great Western Packing Co.* (1943) 21 Cal.2d 636, 637 [134 P.2d 242]; see also *Citizens for Open Access etc. Tide, Inc. v. Seadrift Assn.* (1998) 60 Cal.App.4th 1053, 1065 [71 Cal.Rptr.2d 77].)" (*Rodgers v. Sargent Controls & Aerospace* (2006) 136 Cal.App.4th 82, 89–90 [38 Cal.Rptr.3d 528] (*Rodgers*).)

■ " ' "Traditionally, collateral estoppel has been found to bar relitigation of an issue decided at a previous proceeding 'if (1) the issue necessarily decided at the previous [proceeding] is identical to the one which is sought to be relitigated; (2) the previous [proceeding] resulted in a final judgment on the merits; and (3) the party against whom collateral estoppel is asserted was a party or in privity with a party at the prior [proceeding].' . . ." [Citations.]' (*People v. Carter* (2005) 36 Cal.4th 1215, 1240 [32 Cal.Rptr. 3d 838, 117 P.3d 544]; see also *Lyons v. Security Pacific Nat. Bank* (1995) 40 Cal.App.4th 1001, 1015 [48 Cal.Rptr.2d 174].) 'In addition to these factors, . . . the courts consider whether the party against whom the earlier decision is asserted had a "full and fair" opportunity to litigate the issue.' (*Roos v. Red* (2005) 130 Cal.App.4th 870, 880 [30 Cal.Rptr. 3d 446].)" (*Rodgers, supra,* 136 Cal.App.4th 82, 90.)

■ "Importantly, 'collateral estoppel is not mechanically applied, and in each case the court must determine whether its application will advance the public policies which underlie the doctrine. [Citation.] Those policies are "(1) to promote judicial economy by minimizing repetitive litigation; (2) to prevent inconsistent judgments which undermine the integrity of the judicial system; and (3) to provide repose by preventing a person from being harassed by vexatious litigation." ' [Citations.]" (*Alpha Mechanical, Heating & Air Conditioning, Inc. v. Travelers Casualty & Surety Co. of America* (2005) 133 Cal.App.4th 1319, 1333 [35 Cal.Rptr.3d 496].) Also, collateral estoppel will not be applied "if injustice would result or if the public interest requires that

relitigation not be foreclosed." (*Consumers Lobby Against Monopolies v. Public Utilities Com.* (1979) 25 Cal.3d 891, 902 [160 Cal.Rptr. 124, 603 P.2d 41].)

■ As in *Rodgers*, the elements of identity of issues and a final adjudication of the issue on the merits are definitely established. Respondent does not dispute that the opinion in *Praxis v. Richman* finally determined the controlling issue of Greene's liability for malpractice in dealing with the right of Praxis to proceed with development of the property under the joint venture agreement with Specialty. If any malpractice committed by Greene did not as a matter of law damage Praxis or cause the joint venture agreement to fail, then neither Greene nor Caspari may be found liable to respondent for his real estate commissions that were entirely dependent upon development of the property. Stated differently, any malpractice claim against Caspari based upon his failure to timely file a malpractice action against Greene has necessarily been resolved against respondent by the decision in *Praxis v. Richman* that Greene has no liability for malpractice.

■ We therefore move to the remaining requirement of collateral estoppel, an identity or privity of the parties. Praxis was the unsuccessful party in *Praxis v. Richman*, while respondent is the party against whom collateral estoppel has been asserted here. Without a strict identity of parties, collateral estoppel must be based upon the concept of privity. "Collateral estoppel applies not only to parties to an action or proceeding, but also to those in privity with the parties." (*Marie Y. v. General Star Indemnity Co.* (2003) 110 Cal.App.4th 928, 955 [2 Cal.Rptr. 3d 135].) Privity " 'refers "to a mutual or successive relationship to the same rights of property, or to such an identification in interest of one person with another as to represent the same legal rights [citations] and, more recently, to a relationship between the party to be estopped and the unsuccessful party in the prior litigation which is 'sufficiently close' so as to justify application of the doctrine of collateral estoppel. [Citations.]" [Citations.] " 'This requirement of identity of parties or privity is a requirement of due process of law.' [Citation.] . . ." [Citations.]' (*Citizens for Open Access etc. Tide, Inc. v. Seadrift Assn., supra,* 60 Cal.App.4th 1053, 1069–1070; see also *Dawson v. Toledano* (2003) 109 Cal.App.4th 387, 399 [134 Cal.Rptr.2d 689].)" (*Rodgers, supra,* 136 Cal.App.4th 82, 90–91.)[8]

■ " 'Even if these threshold requirements are satisfied, the doctrine will not be applied if such application would not serve its underlying fundamental

---

[8] The concept of privity has evolved beyond its classical description in such cases as *Lewis v. County of Sacramento* (1990) 218 Cal.App.3d 214 [266 Cal.Rptr. 678], *Johnson v. American Airlines, Inc.* (1984) 157 Cal.App.3d 427 [203 Cal.Rptr. 638], and *People ex rel. State of Cal. v. Drinkhouse* (1970) 4 Cal.App.3d 931 [84 Cal.Rptr. 773].

principles.' (*Gikas v. Zolin* [(1993)] 6 Cal.4th 841, 849 [25 Cal.Rptr.2d 500, 863 P.2d 745].) ' "[T]he determination whether a party is in privity with another for purposes of collateral estoppel is a policy decision." [Citations.] "Privity is essentially a shorthand statement that collateral estoppel is to be applied in a given case [assuming the other requirements are satisfied]; there is no universally applicable definition of privity." [Citations.]' (*Ibid.*) 'In the final analysis, the determination of privity depends upon the fairness of binding appellant with the result obtained in earlier proceedings in which it did not participate. [Citation.] " 'Whether someone is in privity with the actual parties requires close examination of the circumstances of each case.' [Citation.]" [Citation.]' (*Citizens for Open Access etc. Tide, Inc. v. Seadrift Assn., supra,* 60 Cal.App.4th 1053, 1070.) ' "We review the court's conclusion of privity de novo . . . because the issue, which ultimately involves the requisites and limits of due process, is a legal one." [Citation.]' (*Victa v. Merle Norman Cosmetics, Inc.* (1993) 19 Cal.App.4th 454, 464 [24 Cal.Rptr.2d 117].)" (*Rodgers, supra,* 136 Cal.App.4th 82, 91.)

Of paramount consequence in the present case is the glaring interconnectedness of the rights and interests of respondent and Praxis. To obtain their stated objective of profiting from the project, both depended upon the successful development of the property, and strove together to achieve that end: Praxis by seeking to obtain the necessary approvals and financing; respondent by finding tenants for the proposed office complex pursuant to his "Exclusive Right to Lease Agreement" with BLA. Respondent acknowledged that he did not distinguish between his and Praxis's claims under the agreement: "They were one in the same;" his "rights were derivative of Praxis' rights." Thus, respondent had a proprietary interest that was closely linked to the success of Praxis in its litigation with Specialty and Greene.

In addition to a unity of interests, we find in the record an adequate representation of those interests in the prior litigation. "A party is adequately represented for purposes of the privity rule 'if his or her interests are so similar to a party's interest that the latter was the former's virtual representative in the earlier action. [Citation.]' [Citation.] We measure the adequacy of 'representation by inference, examining whether the . . . party in the suit which is asserted to have a preclusive effect had the same interest as the party to be precluded, and whether that . . . party had a strong motive to assert that interest. . . .' [Citation.]" (*Citizens for Open Access etc. Tide, Inc. v. Seadrift Assn., supra,* 60 Cal.App.4th 1053, 1070–1071 (*Citizens*).) " 'Privity involves a person so identified in interest with another that he represents the same legal right. [Citations.]' [Citations.]" (*Dawson v. Toledano, supra,* 109 Cal.App.4th 387, 399.) Respondent had the same motive as Praxis to first save the agreement in the suit against Specialty, then failing that to obtain a finding of Greene's liability for malpractice. By all accounts respondent also intimately and vigorously participated in both the *Specialty v. Praxis* dispute and the

*Praxis v. Richman* case. Respondent testified that he assisted Greene with the representation of Praxis in the suit against Specialty because his contract with BLA gave him "a vested interest to make sure that they were successful." He gathered facts to support the case and even sat at the counsel table during trial. Levin agreed that respondent was a valuable source of information and contributed heavily to the presentation of the case. Then again during the preparation and presentation of the malpractice case against Greene and the Richman law firm, respondent was the primary consultant and source of information for Caspari, particularly given the absence of Levin.

■ We further find that preclusion of respondent's action does not offend due process principles, which limit the scope of the collateral estoppel doctrine. (*Rodgers, supra,* 136 Cal.App.4th 82, 94; *Vega v. Jones, Day, Reavis & Pogue* (2004) 121 Cal.App.4th 282, 298–299 [17 Cal.Rptr.3d 26].) "[C]ollateral estoppel may only be applied where due process requirements are met." (*Old Republic Ins. Co. v. Superior Court* (1998) 66 Cal.App.4th 128, 154 [77 Cal.Rptr.2d 642].) " 'In the context of collateral estoppel, due process requires that the party to be estopped must have had an identity or community of interest with, and adequate representation by, the losing party in the first action as well as that the circumstances must have been such that the party to be estopped should reasonably have expected to be bound by the prior adjudication.' " (*Sutton v. Golden Gate Bridge, Highway & Transportation Dist.* (1998) 68 Cal.App.4th 1149, 1155 [81 Cal.Rptr.2d 155], quoting from *Clemmer v. Hartford Insurance Co.* (1978) 22 Cal.3d 865, 875 [151 Cal.Rptr. 285, 587 P.2d 1098].) " 'The "reasonable expectation" requirement is satisfied if the party to be estopped had a proprietary interest in and control of the prior action, or if the unsuccessful party in the first action might fairly be treated as acting in a representative capacity for the party to be estopped. [Citations.] Furthermore, due process requires that the party to be estopped must have had a fair opportunity to pursue his claim the first time. [Citation.]' [Citation.]" (*Old Republic Ins. Co. v. Superior Court, supra,* at p. 154.)

Respondent not only should reasonably have expected to be bound by the prior decisions in *Specialty v. Praxis* and *Praxis v. Richman,* he knew his own claims were dependent for success upon resolutions favorable to Praxis in those prior cases. He was also aware that if Praxis prevailed in those prior actions the results would be binding on the defendants in any subsequent litigation he pursued. To facilitate protection of his interests, respondent provided considerable assistance to the legal efforts of Praxis to pursue its claims against Specialty and Greene. Respondent may not have controlled the Praxis litigation, but he participated so closely in it in concert with Praxis that his interests were thoroughly represented. (*Martin v. County of Los Angeles* (1996) 51 Cal.App.4th 688, 701 [59 Cal.Rptr.2d 303].)

■ Respondent points out that the representation of his interests by Praxis in the prior suits was not in fact "adequate," as illustrated by the lack of "favorable" outcomes and the resulting malpractice claims. He also directs our attention to additional evidence and arguments presented in his case against Caspari—particularly "contract law defenses" to the tolling of the option period, as explained by his expert witness—that were not offered or considered in *Praxis v. Richman*. But a finding of privity does not depend upon an identity of evidence or arguments presented; nor does it depend upon the result obtained. In *Citizens, supra*, 60 Cal.App.4th 1053, 1072, we observed that the rights of the party to be collaterally estopped were "zealously pursued" by a party in privity who seemed "to have been equally motivated to reach a successful conclusion of the litigation . . . ." We did not require an assessment of the quality or competence of the prior legal representation provided. "The cases do not undertake to measure the adequacy of the representation on the basis of an assessment of the performance of the losing party's counsel." (*Aronow v. LaCroix* (1990) 219 Cal.App.3d 1039, 1049 [268 Cal.Rptr. 866].) The result of the prior litigation and the trial tactics used are not factors of consequence in our resolution of the collateral estoppel issue before us. Here, respondent was adequately represented for the purposes of the privity requirement of collateral estoppel.

We are also convinced that a finding of privity in the present case serves the underlying fundamental principles of the collateral estoppel doctrine. If the threshold requirements are met, "the propriety of preclusion depends upon whether application will further the public policies of 'preservation of the integrity of the judicial system, promotion of judicial economy, and protection of litigants from harassment by vexatious litigation.' [Citation.]" (*Castillo v. City of Los Angeles, supra*, 92 Cal.App.4th 477, 481.) Application of collateral estoppel does not contravene respondent's due process rights, and thereby maintains the integrity of the judicial system. Judicial economy is neither served nor disserved,[9] but more importantly, precluding relitigation of Greene's malpractice avoids harassment of appellants and prevents not only the possibility, but the reality of inconsistent judgments. We perceive an inherent contradiction and unfairness to appellants from a finding that they are liable to respondent for failing to properly pursue an action for Greene's malpractice, while Greene, whose underlying and primary negligence is the essential underlying basis for that liability, has been absolved of any actionable negligence. We therefore conclude that the final decision in *Praxis v. Richman* bars respondent's claim against appellants for legal malpractice.

---

[9] As we have noted, the present case proceeded to trial before the judgment in *Praxis v. Richman* was final. If the final judgment in *Praxis v. Richman* occurred before trial of the present case, judicial economy would have been served by precluding relitigation of the issue.

## DISPOSITION

Accordingly, the judgment in favor of respondent is reversed. The case is remanded to the trial court with directions to enter judgment in favor of appellants. Costs on appeal are awarded to appellants.

Marchiano, P. J., and Stein, J., concurred.

A petition for a rehearing was denied June 27, 2006, and respondent's petition for review by the Supreme Court was denied July 12, 2006, S142763.