[No. A115177. First Dist., Div. Five. June 26, 2008.]

WILLIAM J. MURPHY, JR., Plaintiff and Respondent, v.
MAUREEN MURPHY, Individually and as Trustee, etc., Defendant and
Appellant.

## Counsel

Hanson Bridgett Marcus Vlahos & Rudy, David W. Baer and S. Anne Johnson for Defendant and Appellant.

The Huster Law Group, Thomas Huster and John K. Huster for Plaintiff and Respondent.

## Opinion

**SIMONS, J.**—Pursuant to Probate Code section 2580 et seq.,[1] a person subject to a conservatorship may invoke the jurisdiction of the probate court to execute a testamentary instrument. The probate court has discretion, circumscribed by the statutory scheme, to order a "substituted judgment" that authorizes a conservator on behalf of a conservatee to take necessary or desirable action to facilitate estate planning, when a reasonably prudent person in the conservatee's position would do so. In 2003, the probate court issued such an order on behalf of William J. Murphy,[2] the father of the two parties. The probate court's order authorized William's conservator to execute a living trust and pour-over will implementing an estate plan that effectively disinherited William's son, William J. Murphy, Jr. (respondent). In 2004, following William's death, respondent sued his sister, Maureen Murphy, individually and as trustee of the William J. Murphy Revocable Living Trust (appellant), alleging breach of an oral contract, undue influence, intentional interference with contract, and fraud.[3] Following a lengthy trial, the court issued a judgment in favor of respondent imposing a constructive trust over one-half of William's real and personal property in existence on the date of his death.

Appellant raises a host of challenges to the probate court's ruling. We conclude, as a matter of first impression, that the instant action is barred by principles of collateral estoppel, and reverse.

---

[1] All undesignated section references are to the Probate Code.

[2] Solely for clarity, William J. Murphy and his deceased wife, Elaine T. Murphy, will be referred to by their first names. No disrespect is intended.

[3] The trial court found in favor of appellant on the fourth cause of action alleging elder abuse. We therefore do not address that cause of action, and our reference to "all causes of action" means the first, second, third and fifth causes of action.

# BACKGROUND

## Testamentary Dispositions

On December 24, 1962, Elaine and William executed holographic wills, each leaving their entire estate to the surviving spouse to do with as he or she saw fit. The wills do not mention their children. Elaine died in January 1999.

On September 20, 2000, William executed a holographic will that devised the family home on Stonecrest in San Francisco and a home on 32nd Avenue in San Francisco to appellant, a vacation home on the Russian River to respondent, one-third of the residue of his estate to respondent and two-thirds of the residue of his estate to appellant. William's will designated both parties as executors of his estate.

On June 18, 2001, William executed a holographic will devising his entire estate to appellant except for $1 to respondent.

On July 3, 2001, William executed "The William J. Murphy Revocable Living Trust Agreement" (hereafter living trust), appointing appellant successor trustee, and leaving his estate to appellant except for $1 to respondent. On July 13, 2001, William executed a pour-over will, directing his estate to be distributed pursuant to the living trust, and appointed appellant executor.

In 2003, William's living trust and pour-over will were reexecuted by conservator Debra Dolch for William, as trustor, nunc pro tunc as of July 3, 2001, pursuant to the probate court's substituted judgment order. The terms of the living trust executed by Dolch were identical to William's July 3, 2001 living trust. In April 2004, appellant executed the living trust, as trustee.

## Family History

Elaine and William were married in 1949. In 1991, when Elaine became ill, appellant moved back into the family home where William and Elaine resided. At the time of Elaine's death in 1999, William was 74 years old and a practicing attorney. Some persons involved with him expressed concern that he became depressed after Elaine's death and never fully recovered. In April 2001, William suffered a debilitating stroke.

## Probate Court Proceedings

### *June 2001 Petition for Conservatorship*

On June 15, 2001, following William's stroke, at respondent's request and nomination, Dolch, a private professional conservator, petitioned the probate

court for appointment as conservator of William's person and estate. Respondent's declaration attached to the petition reflects a history of discord between appellant and respondent. It states respondent nominated Dolch to act as conservator out of concern that appellant was "isolating and may be unduly influencing [William] in his condition of reduced capacity as he is recovering from his stroke." Respondent's declaration further states the following: While William was hospitalized for his stroke, appellant falsely accused respondent of physically abusing William; appellant "may" have imposed her will upon William, who cancelled an agreement for respondent to accompany William and physical therapists to inspect William's residence; due to appellant's "gate keeping," respondent did not receive calls from William; appellant took over William's law office and terminated the employment of William's paralegal assistant; appellant "may" have wrongly informed William that respondent did not want to be present during William's stroke recovery process; and appellant had the locks changed at the Stonecrest home and attempted to change the locks at William's law office without William's knowledge. Respondent's declaration also noted that William was to receive more than $800,000 from a trust of which Dolch was the trustee, and Elaine's jewelry, valued at more than $300,000, was in William's possession, and William was unable to protect and manage these assets.

On June 22, 2001, Dolch was appointed temporary conservator of William's estate.

### December 2001 Court Investigator's Initial Report

The December 3, 2001 report by probate court investigator Cynthia Jones stated she interviewed William on October 5, 2001, after which she determined his care arrangements appeared adequate without a conservatorship of the person, but William was unable to manage his own financial resources and resist fraud or undue influence. The report also noted that William did not consent to the establishment of the conservatorship. William said if it were determined a conservator was necessary, he did not consent to Dolch's serving as the conservator, and instead, "[I]t would be [appellant]." The report noted that the initial request for a conservator arose from concerns that appellant could be unduly influencing William and isolating him for her own financial benefit. The report stated, "[William] strongly rejects these concerns and the allegations set forth in the moving papers." He consented to appointment of a temporary conservator of his estate to close out his pending cases and to complete the estates of two decedents from which he will inherit and to pay off a sizeable personal debt, but "staunchly oppose[d]" continuing the conservatorship thereafter.

The "General Background Information" section of the report stated that, after William's stroke, respondent and some of William's longtime employees became suspicious that appellant was isolating William and alienating him from other family members and friends in order to increase his dependence on her. Respondent and others accused appellant of failing to keep the family home clean and habitable and to provide proper meals to William. Respondent and appellant accused each other of abuse. Appellant accused respondent of physically abusing William while he was hospitalized following his stroke, and in the past, coming to the family home drunk and " 'roughing people up.' " The report stated that declarations by William's former secretary and paralegal described appellant as abusing drugs and prescription narcotics, and as attempting to control William's law office and the disposition of his cases after his stroke. The report stated that problems with William's personal and business financial affairs developed over years of poor management, while some were linked to his stroke.

The report noted that during Jones's private interview with William he was able to state the general nature and extent of his assets and was aware of his debts. William said appellant had been a great help to him and he did not know what he would do without her. He insisted that appellant had not interfered with any of his social relationships and he still saw his friends. William said he was angry with respondent for making the conservatorship referral and said, " '[Respondent] brought the family business public and he tried to make me look incompetent.' "

The report noted that, during Jones's interview with Dolch, Dolch expressed concern about "[appellant] and her motives." Dolch felt strongly that an independent conservator was necessary to handle William's financial affairs and close out his law practice and Dolch had "continuing concerns about [appellant] and the issue of the management of the remainder of the estate."

According to the report, respondent said that after William's stroke appellant began to exert increasing control over William's personal life and business, and did not want respondent to assist with managing William's law practice or to learn of a large inheritance William was to receive. Respondent expressed concern about William's being susceptible to appellant's influence due to depression that began when Elaine died; William's increasing cognitive problems and his increased isolation by appellant; and the stroke, which made William more dependent on appellant.

The report noted that appellant said the conservatorship was unnecessary and was the result of respondent's attempts to interfere with her and William's lives. She denied ever isolating William or trying to influence or

control him, said she had not consumed alcohol in years, and denied there was ever any legitimate concern about the condition of the home or her care of William.

The report stated that a neuropsychological evaluation by Dr. Abraham Nievod concluded that William's cognitive functioning was impaired in a number of areas, and he demonstrated poor judgment and a lack of insight into his own condition. Nievod concluded William was unable to practice law or independently manage his own financial affairs. As to whether appellant had attempted to unduly influence William, Nievod concluded, "the relationship between [William and appellant] is more in the nature of a 'folie a deux,' with both acting in concert to deny William's impairments and inability to function, both socially and professionally, as he has for years." Nievod opined that William's impairments should render him vulnerable to undue influence and "describe[d] actions [appellant had] undertaken which are common to one who is trying to exercise undue influence (social isolation and control). However, [Nievod saw] these actions as a desperate attempt to maintain the image that [William] has presented throughout his working life rather than a calculated attempt to unduly influence." Due to appellant's inability to realistically assess William's needs and impairments, and her own financial and psychological dependence on William, Nievod opined that a neutral conservator of the estate would be in William's best interest.

Jones's report concluded that, because of the family's "considerable amount of dysfunction and conflict," a professional, neutral conservator of William's estate should be appointed. She concluded, "whether or not [appellant] has tried to unduly influence [William], her actions with respect to [his] law practice can at best be viewed as imprudent and her financial dependence on him places her in a position of potential conflict."

On December 13, 2001, Pro Tempore Judge McMath (Judge McMath) issued an order appointing Dolch general conservator of William's estate.

### June 2002 Petition to Terminate Conservatorship

On June 4, 2002, Gregory O'Keeffe, proposed attorney for William, petitioned the probate court on William's behalf to terminate the conservatorship and transfer all assets to William's living trust. The verified petition, executed by William, alleged that Dolch had accomplished the goals required when the conservatorship was established: William had executed a living trust on July 3, 2001, naming himself trustee; William had given appellant his power of attorney; and William was capable of managing his own financial affairs "particularly with the help of [appellant] through the use of the power of attorney." The petition also alleged Dolch had consented to termination of the conservatorship.

*July 2002 Court Investigator's Review Report*

A July 2002 review report filed by Jones pursuant to section 1851 stated that when the initial conservatorship referral was made there were concerns that appellant was isolating William and subjecting him to undue influence, and concerns regarding management of a large inheritance that William was due to receive. Dolch discovered that William had some complex personal and professional financial problems and helped to resolve them. William denied that appellant isolated or unduly influenced him, but acknowledged the need for help with the problems regarding his personal and business affairs. The report noted that "[t]he question of undue influence is often difficult to evaluate." It noted that Nievod's report did not conclude appellant had intentionally attempted to unduly influence William, but "did express concern about what he perceived as [appellant's] psychological and financial dependence on [William]," and opined that appointment of a neutral conservator was most prudent.

Jones's report stated that Dolch was not opposed to termination of the conservatorship with future estate management through William's living trust, if the living trust were supervised by the court. Dolch also understood that appellant would be taking an active role as successor trustee. Dolch suggested that, if the court supervised the living trust, appellant should be allowed a monthly fee for her services as trustee, providing her a monthly income of her own. Dolch understood that respondent was not opposed to the requested termination of the conservatorship.

The report noted that William was able to effectively express himself and his wishes, said he preferred to have continued asset management of his estate through the living trust rather than through conservatorship of the estate, and was comfortable with appellant's taking an active role in management of the living trust. William continued to benefit from appellant's assistance with running the home and daily activities, and she was his primary social contact. William said that over the course of the conservatorship respondent had visited him about three times and described the visits as a "little awkward, but without problems." William acknowledged that, given respondent's suspicions about appellant, it would be best to have the court supervise and approve the living trust management. William also agreed appellant should receive a monthly trustee service fee, as approved by the court, and expressed his gratitude for her help and companionship.

The report stated that appellant was comfortable with the idea of assisting with William's finances through his living trust and ultimately understood that court supervision could protect William as well as her actions as trustee. She said she was wrongly suspected of trying to influence William for her own benefit.

The report recommended the court terminate the conservatorship of the estate and transfer the assets to William's living trust subject to court supervision, and appoint O'Keeffe practice administrator for William's closed law practice.

### *October 2002 Amendment to Petition to Terminate Conservatorship and Ratify Living Trust*

On October 16, 2002, William filed an amendment to his petition to terminate the conservatorship, in which he sought ratification of the living trust he executed in 2001 under the substituted judgment provisions of section 2580 et seq. William also requested that appellant be nominated as successor trustee and sought authorization to pay her monthly compensation for services rendered during the conservatorship period. The amendment stated: "The circumstances surrounding [the living trust] or the drafting of the [living t]rust commenced many months prior to the establishment of the temporary conservatorship . . . . As early as September 2000, [William] had contemplated the drafting of a . . . living trust and had himself prepared a will reflecting his own testamentary intent and notes concerning the preparation of the [living t]rust as early as September 2000. The [living t]rust was drafted long before the June 20, 2001, temporary [conservatorship] hearing and was drafted without any anticipation that a temporary conservatorship would be filed." The amendment stated that William was competent at the time the living trust was executed and continued to be competent to make testamentary decisions. It requested that, pursuant to section 2583, the living trust be ratified based on: (1) William had legal capacity to enter into the living trust on July 3, 2001; (2) the living trust expressed his testamentary intent; and (3) the living trust reflected his wishes as previously stated in his holographic wills of September 20, 2000, and June 18, 2001. Written notice of the amendment to the petition was served on respondent.

On November 12, 2002, respondent filed written, verified objections to William's June 2002 amended petition and its October 2002 amendment. He asserted there was no evidence other than William's own statement to rebut the evidence that supported creation of the conservatorship, and, on procedural grounds, argued that a conservatee cannot request a substituted judgment. Respondent stated that, although signed by William, the petition "does nothing for [William's] interests and seems drafted solely for the benefit of [appellant]. The motives for such a petition and its ultimate 'authorship' are highly suspect." Respondent also objected that the petition failed to state facts sufficient to establish that the conservatorship was no longer needed because the conservatee was able to care for his property and resist fraud or undue influence. He also objected to the payment to appellant because it was not submitted to the conservator and was unsupported by a detailed statement of

hours worked. Further, he contended the payment should be offset for appellant's occupancy of William's home and other support received.

On November 14, 2002, O'Keeffe, as William's attorney, filed a response to respondent's objections stating that William's amendment to the petition for termination of the conservatorship and for transfer of his assets to his living trust was prepared and filed as a result of a stipulation between Dolch, Dolch's attorney, and O'Keeffe. The response also stated that William wanted to live with appellant and she would provide William companionship and help in his elder years. It also stated, "familial discord has resulted from the steps taken by [respondent] in helping to institute the [c]onservatorship, however well meaning. These new objections from [respondent] have caused further discord and outrage, in the mind of [William, who] is prepared to litigate fully his rights to terminate this [c]onservatorship and manage his own affairs through his [living t]rust." Alternatively, O'Keeffe suggested mediation of the matter, which, "if successful, will save the stress on [William's] health that this unnecessary and protracted litigation will surely cause."

### *December 2002 Amended Petition for Substituted Judgment*

On December 20, 2002, pursuant to section 2580, subdivision (b)(5) and (13), William filed and executed a verified amended petition for substituted judgment requesting the court to "ratify and confirm the execution of the [living trust] by [William], as Conservatee," and to order the transfer of all assets held in the conservatorship to the living trust.[4] The petition stated the living trust would be subject to court supervision. A copy of the living trust was attached to the petition. The petition also requested the court to confirm the execution of William's July 13, 2001 pour-over will, a copy of which was attached to the petition. The petition stated that the living trust reflected William's testamentary intent, he had and continues to have testamentary capacity, and he knew the nature and extent of his assets. The petition stated that the living trust and pour-over will were not the result of fraud or undue influence by "any party" and reflected William's testamentary intent and estate plan. The petition noted that the living trust named William as trustee, requested that for "convenience purposes," appellant be appointed successor trustee of the living trust, and stated that William had executed a renunciation of the right to serve as trustee of the living trust, subject to the appointment of appellant as successor trustee. The petition stated it was in William's best

---

[4] The December 2002 petition did not refer to or incorporate the October 2002 amendment of William's petition for termination of the conservatorship and transfer of assets. The December 2002 petition therefore superseded the October 2002 amendment and became the operative petition seeking substituted judgment.

interest that (1) the living trust be ratified and confirmed, and administered under court supervision, (2) appellant be ordered to serve as successor trustee, and (3) all assets of the conservatorship be transferred to the living trust to remain under court supervision. It also specified that respondent was entitled to notice of the petition under section 2581 and had requested special notice. Written notice of the petition was sent to respondent.

No objection was filed to the amended petition for substituted judgment. The record indicates the matter was heard on January 6, 2003.[5]

### *Order Authorizing Substituted Judgment*

On April 14, 2003, the probate court (Judge McMath) issued an order authorizing a substituted judgment to create and fund a revocable living trust and execute a pour-over will, nunc pro tunc as of July 3, 2001. The order first noted that no objection or exception to the petition had been made or filed.[6] The order then stated the probate court found that (1) all notices of the hearing were given as required by law; (2) William had requested and was not opposed to the actions authorized by the court regarding creation of a living trust and execution of a will; (3) the actions authorized by the order under section 2580 would have no adverse effect on William's estate; and (4) the order was in the best interest of William and his estate. The order then (1) authorized and directed Dolch to execute nunc pro tunc as of July 3, 2001, William's living trust; (2) authorized and directed Dolch to execute nunc pro tunc as of July 13, 2001, William's pour-over will; (3) appointed appellant successor trustee of the living trust; (4) stated the living trust was subject to court supervision and the successor trustee would file a surety bond prior to funding of the living trust by the conservator; (5) stated that after the successor trustee (appellant) posted the surety bond and Dolch retained an amount in reserve, Dolch was authorized and directed to transfer the balance of property of the conservatorship estate to the successor trustee for administration; (6) directed Dolch to file a postproperty transfer supplemental accounting; (7) authorized appellant to pay herself $7,500 for prior services rendered; and (8) authorized and directed Dolch to transfer all remaining client files from William's law practice to O'Keeffe. Respondent did not appeal the substituted judgment order. On May 12, 2003, nunc pro tunc as of

---

[5] The record before us does not contain a reporter's transcript from the hearing on the substituted judgment petition.

[6] Section 1022 provides that "An affidavit or verified petition shall be received as evidence when offered in an uncontested proceeding under th[e Probate Code]."

July 3, 2001, Dolch, for William, "Trustor," executed the living trust. Appellant, as trustee, executed the living trust on April 15, 2004, nunc pro tunc as of July 3, 2001.[7]

William died on May 25, 2004.

On June 2, 2004, the probate court (Judge Dearman) issued an order terminating the conservatorship, settling the supplemental account and allowing for conservatorship fees and attorney fees to the conservator's counsel. Attached as an exhibit to the order was William's living trust executed by Dolch for William as trustor and by appellant as trustee dated nunc pro tunc as of July 3, 2001. Respondent did not appeal the June 2, 2004 order.

### The Instant Civil Action

On August 13, 2004, respondent filed his original complaint against appellant. On October 27, 2005, respondent filed his second amended (and operative) complaint against appellant seeking redress for his "wrongful disinheritance" by William. The complaint alleged that William and Elaine entered into an oral testamentary agreement (testamentary agreement) providing that whichever of them survived would leave all of his or her property to the parties equally; William breached the testamentary agreement by executing the living trust in July 2001, leaving respondent $1 and the residue of William's and Elaine's property to appellant. It sought a constructive trust on "all of [William's] and [Elaine's] assets and enforcement of the [t]estamentary [a]greement."

The first cause of action for quasi-specific performance, imposition of a constructive trust, and breach of an oral contract, alleged that William breached the testamentary agreement by leaving all of his and Elaine's property to appellant. The second cause of action for undue influence alleged that appellant exerted undue influence over William after Elaine's death and, therefore, respondent sought to "rescind and nullify" the living trust "and all purported testamentary dispositions executed by [William] after [Elaine's] death and his acceptance of her one-half share of their community property." It also asserted that, as a result of appellant's undue influence over William, she wrongfully held title to all of William's assets and income therefrom. The third cause of action for intentional interference with contract alleges that appellant had knowledge of the testamentary agreement and induced William's breach of that agreement. The fifth cause of action for fraud

---

[7] As noted by the trial court in its statement of decision, the provisions of the living trust executed by Dolch and appellant are identical to those in the living trust executed by William on July 3, 2001.

alleged that on numerous occasions appellant made willfully untrue representations to William regarding respondent by which appellant intended to deceive and did deceive William into disinheriting respondent and leaving all his property to appellant.

The complaint's prayer sought damages; an order that appellant return all of respondent's property in appellant's possession or under her control; an order that appellant be deemed to have predeceased William and therefore was not entitled to receive any property from William's will or trusts or by the laws of intestacy; and interest and costs.

Appellant filed motions in limine asserting that the probate court had exclusive subject matter jurisdiction over the instant action and collateral estoppel barred all of the causes of action because the validity of William's living trust, including the issues of William's capacity, intent and undue influence were actually litigated and finally decided on the merits in the substituted judgment proceeding. Appellant also filed a motion in limine arguing that each of plaintiff's causes of action failed to state a cause of action because the operative living trust disinheriting respondent was the living trust executed by the conservator for William in 2003 pursuant to the substituted judgment proceeding, not the 2001 living trust executed by William. Thus, appellant argued, William could not have breached the testamentary agreement because the operative 2003 living trust was ordered by the court and executed by the conservator. Similarly, she argued that the causation element was lacking as to the interference with contract, undue influence, and fraud claims because the decision to execute the operative 2003 living trust reflected the court's substituted judgment based on its exercise of discretion.

### Statement of Decision

Following a lengthy trial, the court issued a 27-page statement of decision. The court rejected appellant's claim that the probate court had exclusive subject matter jurisdiction over the action. In ruling that the substituted judgment procedure did not collaterally estop respondent's undue influence claim, the court found that the undue influence issue was not tried and there was no identity of parties or interests. In addition, the court found that, in the substituted judgment proceedings, respondent did not have access to the reports of Nievod and Jones. Finally, the court found that Jones testified she did not evaluate William for testamentary capacity and only evaluated the issue of undue influence as to whether or not it was a reason for a conservatorship.

As to the first cause of action, the court found by clear and convincing evidence that respondent proved the existence of a testamentary agreement

between William and Elaine, William breached the testamentary agreement, Elaine relied on the testamentary agreement resulting in an unconscionable injury to respondent, and Elaine's forbearance from making a disposition different from that in the testamentary agreement estopped appellant from raising the statute of frauds.

As to the second cause of action, the court found by clear and convincing evidence that William's September 20, 2000, June 18, 2001, July 3, 2001, and July 13, 2001 testamentary instruments were procured by appellant's undue influence, resulting in respondent's disinheritance.

As to the third cause of action, the court found that appellant knew of the oral testamentary agreement and intentionally interfered with it by her misrepresentations, which caused William to breach that agreement.

As to the fifth cause of action, the court found that appellant made numerous false representations including the accusations that respondent: "beat up [William] in the hospital and that security had to be called," wanted to take over William's law practice and control its finances, and wanted to put William in a retirement home. The court concluded that these representations were relied upon by William, caused him to turn against respondent and induced him to change his testamentary disposition and disinherit respondent.

As to the first, second, third and fifth causes of action, the court found respondent was entitled to a constructive trust over one-half of William's real and personal property in existence on his date of death, and awarded respondent money damages for one-half of any real or personal property no longer in appellant's possession, or respondent could elect money damages for all items. Appellant filed a timely notice of appeal from the judgment.

## DISCUSSION

### I. *Substituted Judgment Statutory Scheme*

Section 2580 et seq. codifies the common law doctrine of substituted judgment, which provides that a trial court may authorize the transfer of estate property that a conservatee would have transferred had he or she been competent to act. (14 Witkin, Summary of Cal. Law (10th ed. 2005) Wills and Probate, § 1025, pp. 1140–1141.) As explained in *Conservatorship of Hart* (1991) 228 Cal.App.3d 1244 [279 Cal.Rptr. 249] (*Hart*), "The doctrine underlying the substituted-judgment statute was first recognized in California in *Estate of Christiansen* (1967) 248 Cal.App.2d 398[, 424 [56 Cal.Rptr. 505], which] declared 'that the courts of this state, in probate proceedings for the administration of the estates of insane or incompetent persons, have power

and authority to determine whether to authorize transfers of the property of the incompetent for the purpose of avoiding unnecessary estate or inheritance taxes or expenses of administration, and to authorize such action *where it appears from all the circumstances that the ward, if sane, as a reasonably prudent man, would so plan his estate, there being no substantial evidence of a contrary intent.'* . . . Significantly, *Christiansen* did not require that a court find the ward *would have* acted as proposed; instead it adopted an essentially objective prudent-person standard. Thus *Christiansen* contemplated *substitution* of the court's judgment for that of the incompetent person." (*Id.* at pp. 1251–1252, first italics added, citations omitted.)

"The substituted-judgment doctrine was codified in 1979, operative January 1, 1981 (Stats. 1979, ch. 726, § 3, pp. 2403–2405), upon the recommendation of the California Law Revision Commission which intended to 'make[] clear that the court may authorize a conservator on behalf of the conservatee to perform a variety of acts that are necessary or desirable in modern estate planning or management.' (Recommendation Relating to Guardian-Conservatorship Law (Nov. 1978) 14 Cal. Law Revision Com. Rep. (1978) p. 513.) Noting that *Christiansen* had empowered a guardian 'to carry out the presumed donative intent of the ward,' the commission suggested that '[t]he proposed law gives statutory recognition to the doctrine of substituted judgment and lists by way of illustration matters that are to be considered in applying the doctrine. At the same time, the proposed law gives the court discretion and flexibility in applying the doctrine under the circumstances of each case.' [Citation.]" (*Hart, supra,* 228 Cal.App.3d at p. 1252.)[8]

Section 2580[9] provides for an order that authorizes or requires the conservator to take a proposed action for the purpose of (1) benefiting the

---

[8] The substituted judgment statute was repealed and reenacted without substantive change, effective July 1, 1991, as part of an overall reenactment of the Probate Code. (Stats. 1990, ch. 79, §§ 13, 14, p. 463; *Hart, supra,* 228 Cal.App.3d at p. 1252, fn. 2.)

[9] Section 2580 provides in relevant part:

"(a) The conservator or other interested person may file a petition under this article for an order of the court authorizing or requiring the conservator to take a proposed action for any one or more of the following purposes:

"(1) Benefiting the conservatee or the estate.

"(2) Minimizing current or prospective taxes or expenses of administration of the conservatorship estate or of the estate upon the death of the conservatee.

"(3) Providing gifts for any purposes, and to any charities, relatives (including the other spouse or domestic partner), friends, or other objects of bounty, as would be likely beneficiaries of gifts from the conservatee.

"(b) The action proposed in the petition may include, but is not limited to, the following: [¶] . . . [¶]

"(5) Creating for the benefit of the conservatee or others, revocable or irrevocable trusts of the property of the estate, which trusts may extend beyond the conservatee's disability or life. . . . [¶] . . . [¶]

"(13) Making a will."

conservatee or the estate; (2) minimizing current or prospective taxes; or (3) providing gifts to persons or charities which would be likely beneficiaries of gifts from the conservatee. (See *Conservatorship of McElroy* (2002) 104 Cal.App.4th 536, 552–553 [128 Cal.Rptr.2d 485] (*McElroy*).)

■ Section 2581 provides that, 15 days before the hearing on a substituted judgment petition, the petitioner must give notice to all of the following: (1) "The person[s] required to be given notice under . . . [sections] 1460 [through] 1469 (*i.e.*, conservator, conservatee, conservatee's spouse or domestic partner, conservatee's relatives within the second degree, persons who have filed a request for special notice; certain state institutions, if applicable)"; (2) "Beneficiaries under any document that the conservatee executed and that may have testamentary effect, unless the court for good cause dispenses with notice to them"; (3) "The conservatee's intestate heirs if the conservatee were to die immediately, unless the court for good cause dispenses with notice"; and (4) "Any other persons as the court may order." (Cal. Conservatorship Practice (Cont.Ed.Bar 2007) Substituted Judgments, § 18.8, p. 920; see generally *id.*, Notice, § 4.20, pp. 155–156.)

Section 2582 provides that the court may make an order for substituted judgment only if it determines that the conservatee either is not opposed to the order or, if opposed, lacks legal capacity for the proposed action. It also provides that the court must determine either that the action will have no adverse effect on the estate or that the remaining estate will be adequate for the needs of the conservatee and for the support of those persons legally entitled to support, maintenance and education from the conservatee.

Section 2583 provides that, in deciding a motion for substituted judgment, the court must consider "all the relevant circumstances," which may include, but are not limited to, the 13 circumstances enumerated in the section.[10]

Section 2584 states: "After hearing, the court, in its discretion, may approve, modify and approve, or disapprove the proposed action and may authorize or direct the conservator to transfer or dispose of assets or take other action as provided in the court's order."

---

[10] The 13 enumerated circumstances included in section 2583 are:

"(a) Whether the conservatee has legal capacity for the proposed transaction and, if not, the probability of the conservatee's recovery of legal capacity.

"(b) The past donative declarations, practices, and conduct of the conservatee.

"(c) The traits of the conservatee.

"(d) The relationship and intimacy of the prospective donees with the conservatee, their standards of living, and the extent to which they would be natural objects of the conservatee's bounty by any objective test based on such relationship, intimacy, and standards of living.

"(e) The wishes of the conservatee.

"(f) Any known estate plan of the conservatee (including, but not limited to, the conservatee's will, any trust of which the conservatee is the settlor or beneficiary, any power of

■ These provisions are designed, consistent with the Probate Code's conservatorship provisions, "to protect the conservatorship estate for the benefit not only of the persons who will ultimately receive it from the conservatee or his or her personal representative but also (and perhaps primarily) of the conservatee himself or herself." (*Hart, supra,* 228 Cal.App.3d at p. 1253.) In discussing the trial court's discretion under the substituted judgment statutes, *Hart* stated: "The superior court's primary function under the substituted-judgment statute will be to make a decision (as the conservatee would if able) on the basis of information furnished to it. The information the superior court receives may or may not be consistent: If there are issues of fact the court of course must determine whether the issues are material to the decision to be made and then resolve any issues it deems material. [¶] This is not to say that if the facts are undisputed, or are settled by judicial fact-finding, the decision to be made will follow as a matter of law. A given set of facts may permit more than one rational substituted-judgment decision. [¶] The superior court will (as the conservatee would) obtain information, and hear applications and suggestions, from various sources, and will or should obtain a sense of the situation more or less analogous to that the conservatee might have had and inevitably more enlightened than any reviewing court could hope to obtain. In sum the superior court, when called upon to substitute its judgment for that of the conservatee, will be 'a presumptively more capable decisionmaker' and should be given broad latitude." (*Hart, supra,* 228 Cal.App.3d at p. 1254.) The court must satisfy itself that it is "fully and fairly informed" about the proposed exercise of the conservatee's legal rights. (*Ibid.*)

---

appointment created by or exercisable by the conservatee, and any contract, transfer, or joint ownership arrangement with provisions for payment or transfer of benefits or interests at the conservatee's death to another or others which the conservatee may have originated).

"(g) The manner in which the estate would devolve upon the conservatee's death, giving consideration to the age and the mental and physical condition of the conservatee, the prospective devisees or heirs of the conservatee, and the prospective donees.

"(h) The value, liquidity, and productiveness of the estate.

"(i) The minimization of current or prospective income, estate, inheritance, or other taxes or expenses of administration.

"(j) Changes of tax laws and other laws which would likely have motivated the conservatee to alter the conservatee's estate plan.

"(k) The likelihood from all the circumstances that the conservatee as a reasonably prudent person would take the proposed action if the conservatee had the capacity to do so.

"(*l*) Whether any beneficiary is a person described in paragraph (1) of subdivision (b) of Section 21350.

"(m) Whether a beneficiary has committed physical abuse, neglect, false imprisonment, or fiduciary abuse against the conservatee after the conservatee was substantially unable to manage his or her financial resources, or resist fraud or undue influence, and the conservatee's disability persisted throughout the time of the hearing on the proposed substituted judgment." (Italics added.)

■ *Hart* made clear that section 2583 does not require that every circumstance found and considered by the court be consistent with the action proposed in the petition for substituted judgment. (*Hart, supra,* 228 Cal.App.3d at p. 1265.) It also stressed that "no single circumstance, whether or not enumerated in section 2583, should necessarily control the superior court's substituted-judgment decision." (*Id.* at p. 1269.)

When exercising its discretion in considering a substituted judgment petition, the trial court determines whether the information presented in the petition is sufficient or whether a full contested evidentiary hearing is required. (*McElroy, supra,* 104 Cal.App.4th at p. 554.) A substituted judgment petition should be granted only if the court is satisfied, "by a competent showing of all relevant circumstances, that in the last analysis *the proposed action is what a reasonably prudent person in the conservatee's position would have done.*" (*Hart, supra,* 228 Cal.App.3d at p. 1264, italics added; accord, *Conservatorship of McDowell* (2004) 125 Cal.App.4th 659, 665 [23 Cal.Rptr.3d 10], disapproved on other grounds in *Bernard v. Foley* (2006) 39 Cal.4th 794, 816, fn. 14 [47 Cal.Rptr.3d 248, 139 P.3d 1196].)

## II. *Collateral Estoppel*

Appellant contends the substituted judgment order collaterally estopped respondent from arguing in this case that the instruments created resulted from fraud or undue influence and violated an oral testamentary agreement between William and Elaine. The parties acknowledge that application of the collateral estoppel doctrine to a substituted judgment order presents an issue of first impression.

■ " 'Res judicata prohibits the relitigation of claims and issues which have already been adjudicated in an earlier proceeding. The doctrine has two components. " 'In its primary aspect the doctrine of res judicata [or "claim preclusion"] operates as a bar to the maintenance of a second suit between the same parties on the same cause of action.' . . . The secondary aspect is 'collateral estoppel' or 'issue preclusion,' which does not bar a second action but 'precludes a party to an action from relitigating in a second proceeding matters litigated and determined in a prior proceeding.' " [Citations.]' [Citation.]" (*Border Business Park, Inc. v. City of San Diego* (2006) 142 Cal.App.4th 1538, 1563 [49 Cal.Rptr.3d 259] (*Border Business Park*).)

■ "Collateral estoppel is an equitable concept based on fundamental principles of fairness." (*Sandoval v. Superior Court* (1983) 140 Cal.App.3d 932, 941 [190 Cal.Rptr. 29].) "Issue preclusion prevents 'relitigation of issues argued and decided in prior proceedings.' [Citation.] The threshold requirements for issue preclusion are: (1) the issue is identical to that decided in the

former proceeding, (2) the issue was actually litigated in the former proceeding, (3) the issue was necessarily decided in the former proceeding, (4) the decision in the former proceeding is final and on the merits, and (5) preclusion is sought against a person who was a party or in privity with a party to the former proceeding. [Citation.]" (*Castillo v. City of Los Angeles* (2001) 92 Cal.App.4th 477, 481 [111 Cal.Rptr.2d 870] (*Castillo*).)

The parties disagree on whether the issues litigated in the instant action are identical to those litigated in the substituted judgment proceeding, and whether the issues presented here were actually litigated and necessarily decided in the earlier proceeding.[11] We review de novo the trial court's determination that respondent's claims in the instant action are not barred by collateral estoppel. (*Smith v. ExxonMobil Oil Corp.* (2007) 153 Cal.App.4th 1407, 1415 [64 Cal.Rptr.3d 69].)

### A. *Identity of Issues*

Appellant contends that the issues of undue influence, fraud and the existence of the oral testamentary agreement raised in the instant action are identical to those tendered by William's petition in the substituted judgment proceeding. She argues that William's substituted judgment petition expressly sought review, approval and execution of his living trust, including its dispositive provisions, and expressly tendered the issues of fraud, undue influence, and whether the living trust reflected his estate plan.

Respondent contends that these issues were not raised, the substituted judgment order was the result of a stipulation, and the resolution of the issues was "wholly unnecessary" to the substituted judgment order.[12] He contends that the only issues that were "arguably litigated" in the substituted judgment proceeding were those reflected in the section 2582 findings contained in the substituted judgment order: (1) William requested and was not opposed to the court's creation of a living trust and pour-over will; (2) the actions authorized would have no adverse effect on William's estate; and (3) the conservator's execution of the living trust and pour-over will were in the best interest of

---

[11] Although the trial court ruled that there was no identity of parties for purposes of collateral estoppel, that factor is not discussed by the parties, who appear to agree that the court's ruling on this factor was erroneous because respondent had notice of the substituted judgment proceeding and could have objected to William's substituted judgment petition.

[12] Respondent's assertion that the substituted judgment order was the result of a stipulation between William, Dolch, and Dolch's attorney, is not supported by the record before us. As we noted, *ante*, William's December 2002 substituted judgment petition superseded his October 2002 amendment, which was the result of a stipulation. However, nothing in the record establishes the operative petition was the result of a stipulation. Moreover, respondent presents no authority for the proposition that such a stipulation would have barred objections by him. In fact, respondent filed objections to the earlier, stipulated amended petition.

William and his estate. Respondent points to the lack of any findings by the probate court on the issues alleged to be identical by appellant. While findings by the probate court would have been one indication of the issues raised in the substituted judgment proceeding, the lack of such findings does not establish that the issues in the two proceedings were not identical.

 The " 'identical issue' requirement addresses whether 'identical factual allegations' are at stake in the two proceedings . . . ." (*Lucido v. Superior Court* (1990) 51 Cal.3d 335, 342 [272 Cal.Rptr. 767, 795 P.2d 1223].) Respondent's complaint seeks to "rescind and nullify" William's living trust and pour-over will. According to the complaint, these testamentary dispositions resulted from William's breach of an oral testamentary agreement between William and Elaine, and from appellant's fraud, undue influence and interference with the oral testamentary agreement. William's substituted judgment petition alleged that his living trust and pour-over will "were executed by [William] freely and are not the result of fraud or undue influence by any party," and that those instruments reflected his testamentary estate plan. The factual issues of undue influence and fraud are expressly identical in the instant and prior proceedings. The factual issue of whether the dispositive provisions of the living trust and pour-over will reflected William's estate plan were also at stake in both the instant action and the substituted judgment proceeding.

B. *Issues Actually Litigated and Necessarily Decided*

 Appellant contends the issues of undue influence, fraud, and the existence of the oral testamentary agreement raised in the instant action were or could have been actually litigated in the prior substituted judgment proceeding and were necessarily decided. " 'When an issue is properly raised, by the pleadings or otherwise, and is submitted for determination, and is determined, the issue is actually litigated . . . .' " (*Barker v. Hull* (1987) 191 Cal.App.3d 221, 226 [236 Cal.Rptr. 285] (*Barker*).) Whether an issue was " 'necessarily decided . . .' has been interpreted to mean that the issue was not ' "entirely unnecessary" ' to the judgment in the prior proceeding." (*Castillo, supra*, 92 Cal.App.4th at p. 482.)

Determining whether an issue has been actually litigated in the former proceeding can be difficult where the former judgment or order does not show on its face that the particular issue was decided. (7 Witkin, Cal. Procedure (4th ed. 1997) Judgment, § 355, p. 917.) Where more than one issue was involved, the burden of proof is on the party asserting collateral estoppel to show that a particular issue was adjudicated. (*Id.* at p. 918, and cases cited therein.) " 'When an issue is properly raised, by the pleadings or otherwise, and is submitted for determination, and is determined, the issue is actually

litigated . . . . An issue may be submitted and determined on a motion to dismiss for failure to state a claim, a motion for judgment on the pleadings, a motion for summary judgment . . . [,] a motion for directed verdict, or their equivalents, as well as on a judgment entered on a verdict. A determination may be based on a failure of pleading or of proof as well as on the sustaining of the burden of proof.' [Citations.]" (*Barker, supra,* 191 Cal.App.3d at p. 226.) A party urging collateral estoppel must prove that the issue was actually litigated and that the evidence was not restricted, but need not establish that oral testimony, or any particular type of evidence was presented. (*Ibid.*) The entire record in the prior proceeding may be admitted for the purpose of determining whether the issue was raised by the pleadings or otherwise and was decided by the judgment. (7 Witkin, Cal. Procedure, *supra,* Judgment, § 357, p. 921.)

Because appellant's collateral estoppel claim is based on issues that she contends were or *could have been* litigated in the substituted judgment proceeding, we focus on that distinction. As explained by Witkin: "Despite the established principle that collateral estoppel results only as to issues actually litigated . . . , it is often said that a judgment is binding as to all matters which were raised or which might have been raised. [Citation.] Is this latter statement incorrect as applied to subsequent suits on a different cause of action? The conflict appears to be largely one of expression, which may be resolved if 'issues' is given a reasonable meaning. Clearly, a former judgment is not a collateral estoppel on issues which might have been raised but were not; just as clearly, it is a collateral estoppel on issues which were raised, even though some factual matters or legal arguments which could have been presented were not. [Citations.]" (7 Witkin, Cal. Procedure, *supra,* Judgment, § 359, pp. 923–924, italics omitted, citation omitted; accord, *Border Business Park, supra,* 142 Cal.App.4th at p. 1566.)

"The fact that different forms of relief are sought in the two lawsuits is irrelevant, for if the rule were otherwise, 'litigation finally would end only when a party ran out of counsel whose knowledge and imagination could conceive of different theories of relief based upon the same factual background.' [Citation.] . . . '. . . Obviously, if [the matter] is actually raised by proper pleadings and treated as an issue in the cause, it is conclusively determined by the first judgment. But the rule goes further. If the matter was within the scope of the action, related to the subject-matter and relevant to the issues, so that it could have been raised, the judgment is conclusive on it despite the fact that it was not in fact expressly pleaded or otherwise urged. The reason for this is manifest. A party cannot by negligence or design withhold issues and litigate them in consecutive actions. Hence the rule is that the prior judgment is res judicata on matters which were raised or could have been raised, on matters litigated or litigable. . . . "But an issue may not be thus split into pieces. If it has been determined in a former action, it is

binding notwithstanding the parties litigant may have omitted to urge for or against it matters which, if urged, would have produced an opposite result . . . [.] This principle also operates to demand of a defendant that all of its defenses to the cause of action urged by the plaintiff be asserted under the penalty of forever losing the right to thereafter so urge them." ' " (*Interinsurance Exchange of the Auto. Club v. Superior Court* (1989) 209 Cal.App.3d 177, 181–182 [257 Cal.Rptr. 37], italics omitted; accord, *Mobilepark West Homeowners Assn. v. Escondido Mobilepark West* (1995) 35 Cal.App.4th 32, 47–48 [41 Cal.Rptr.2d 393]; *Warga v. Cooper* (1996) 44 Cal.App.4th 371, 377–378 [51 Cal.Rptr.2d 684].) This definition of "issues actually litigated" applies equally in probate cases. "Although the order settling the account is not conclusive as to matters which might have been passed upon but were not, it *is* conclusive as to matters which *are* passed upon although some factual or legal arguments which could have been presented on the issue were not presented. [Citations.]" (*Lazzarone v. Bank of America* (1986) 181 Cal.App.3d 581, 592 [226 Cal.Rptr. 855]; accord, *Noggle v. Bank of America* (1999) 70 Cal.App.4th 853, 862 [82 Cal.Rptr.2d 829].)

(1) *Claims of a Prior Testamentary Agreement Are Barred by Collateral Estoppel*

It is clear that in the substituted judgment proceeding respondent never raised the argument that William's proposed testamentary disposition conflicted with a prior testamentary agreement. However, that argument is barred by collateral estoppel because it could have been raised.

Among the issues necessarily resolved in a substituted judgment proceeding is whether "the proposed action is what a reasonably prudent person in the conservatee's position would have done." (*Hart, supra,* 228 Cal.App.3d at p. 1264.) Evidence of a prior conflicting testamentary agreement would have been relevant to a resolution of that issue. That is, a court persuaded of the existence of such an agreement would be unlikely to authorize execution of an inconsistent testamentary instrument. Because the existence of such an agreement was a matter within the scope of the substituted judgment proceeding, the substituted judgment order precludes consideration of the testamentary agreement in the instant action. (See *Border Business Park, supra,* 142 Cal.App.4th at p. 1566 [contentions asserted in present action could have been raised in opposition to demurrer].)

(2) *Claims of Undue Influence and Fraud Are Barred by Collateral Estoppel*

We conclude that the issues of fraud and undue influence in the instant action were adjudicated and necessarily decided in the substituted judgment proceeding. First, William's December 2002 verified substituted judgment petition tendered those issues by expressly stating that the living trust and

pour-over will executed by him in 2001 were not the result of fraud or undue influence by any party. Second, pursuant to section 2583, the probate court in considering the petition was required to consider all relevant circumstances, and is presumed to have done so prior to granting the petition. (*Ross v. Superior Court* (1977) 19 Cal.3d 899, 913 [141 Cal.Rptr. 133, 569 P.2d 727].) Third, Judge McMath, who presided over the substituted judgment proceeding and issued the substituted judgment order, had also presided over the conservatorship proceedings during the prior year when Dolch was appointed William's conservator. Given the direction contained in section 2583 and Judge McMath's history of involvement with William's conservatorship, we presume Judge McMath knew and considered the family's dysfunctional history, including respondent's accusations regarding appellant's undue influence over William and her misrepresentations to William about respondent. Further, respondent had contended appellant exercised undue influence over William in his objections to William's June 2002 petition and the October 2002 amendment seeking to terminate the conservator. Given the presumption that official duty has been regularly performed (Evid. Code, § 664; *People v. Sangani* (1994) 22 Cal.App.4th 1120, 1138 [28 Cal.Rptr.2d 158]), we conclude Judge McMath considered whether William's living trust and pour-over will resulted from appellant's undue influence and fraud in deciding to issue the substituted judgment order.

Although the probate court made no express findings on the issues of undue influence or fraud in its substituted judgment order, it did find that William requested and was not opposed to creating the living trust and pour-over will, those actions would have no adverse effect on William's estate, and they were in the best interest of William and his estate. The court also had to determine that a reasonably prudent person in William's position would have executed those testamentary instruments. In doing so the court was required to "gather the information necessary to allow it to make a rational decision in place of [William]." (*McElroy, supra*, 104 Cal.App.4th at p. 554.) Implicit in the probate court's decision to grant the petition for substitute judgment and order the conservator to execute the living trust and pour-over will is the conclusion that it had not been proved that these instruments were the result of appellant's fraud and undue influence on William.[13] Based on the record before us, the undue influence and fraud arguments were not "entirely unnecessary" to the order in the substituted judgment proceeding and, therefore, were necessarily decided. (See *Castillo, supra*, 92 Cal.App.4th at p. 482.)

In any event, even if we could not conclude that fraud and undue influence were actually adjudicated in the prior proceeding, we would find them barred

---

[13] The notion of implied findings in substituted judgment proceedings is not without precedent. In *Hart, supra*, 228 Cal.App.3d at pages 1266–1267, the Sixth District noted that the appellant in that case did not question an "implicit conclusion" of the trial court.

in this proceeding. These arguments could have been raised before Judge McMath to persuade her on at least two different issues she necessarily resolved: that the proposed disposition plan was in the best interest of William and his estate and that the plan was objectively reasonable. Therefore, respondent is estopped from raising these contentions here. (See *Border Business Park, supra,* 142 Cal.App.4th at p. 1566.)

## C. *Due Process Considerations*

" '[C]ollateral estoppel may be applied only if due process requirements are satisfied. [Citations.] In the context of collateral estoppel, due process requires that the party to be estopped must have had an identity or community of interest with, and adequate representation by, the losing party in the first action as well as that the circumstances must have been such that the party to be estopped should reasonably have expected to be bound by the prior adjudication. [Citation.] Thus, in deciding whether to apply collateral estoppel, the court must balance the rights of the party to be estopped against the need for applying collateral estoppel in the particular case . . .' " (*Sutton v. Golden Gate Bridge, Highway & Transportation Dist.* (1998) 68 Cal.App.4th 1149, 1155 [81 Cal.Rptr.2d 155]), in order to "advance the public policies which underlie the doctrine" (*Mooney v. Caspari* (2006) 138 Cal.App.4th 704, 717 [41 Cal.Rptr.3d 728]). Stated differently, where, as here, the party to be estopped was a party who participated in the earlier proceeding, due process requires that this party must have had an adequate incentive to fully litigate the issue in the prior proceeding (*Bostick v. Flex Equipment Co., Inc.* (2007) 147 Cal.App.4th 80, 97 [54 Cal.Rptr.3d 28]), and must have had a fair opportunity to pursue his claim the first time (*Mooney,* at p. 717). In addition, in each case the court must determine whether application of collateral estoppel will advance the public policies which underlie the doctrine. (*Id.* at p. 717.) " ' "Those policies are '(1) to promote judicial economy by minimizing repetitive litigation; (2) to prevent inconsistent judgments which undermine the integrity of the judicial system; and (3) to provide repose by preventing a person from being harassed by vexatious litigation.' " [Citations.]' [Citation.]" (*Id.* at p. 717.)

Respondent contends that, even if otherwise applicable, collateral estoppel should not apply here because he had no incentive to litigate his allegations regarding the testamentary agreement and appellant's fraud and undue influence in the substituted judgment proceeding; he did not have a full and fair opportunity to litigate those allegations in that proceeding; and, public policy would not be served by application of the doctrine.

### (1) *Incentive to Litigate*

Respondent appears to argue that he had nothing to gain by raising the issues of the testamentary agreement, fraud and undue influence in the

substituted judgment proceeding because he would have succeeded only in invalidating the living trust, after which William's June 2001 holographic will disinheriting him would have prevailed, and William could have changed his estate plan at any time prior to his death. He also contends he had a "disincentive" to litigate his allegations regarding the testamentary agreement, fraud, and undue influence in the substituted judgment proceeding because O'Keeffe, William's attorney, stated that respondent's objections to the substituted judgment petition and the protracted litigation over William's right to manage his own affairs through the living trust were detrimental to William's health. Moreover, respondent asserts that litigating these issues would have been "financially prohibitive" for him.

 A court's refusal to impose the doctrine of collateral estoppel because of the party's lesser "incentive to litigate," refers to a situation where the issue decided in the prior lawsuit was "nonessential." (*McMillin Development, Inc. v. Home Buyers Warranty* (1998) 68 Cal.App.4th 896, 906–907 [80 Cal.Rptr.2d 611].) Respondent appears to concede that he had notice of, and was a party to, the substituted judgment proceeding. In fact, pursuant to section 2581, he was required to be given notice of the substituted judgment proceeding because he was a first degree relative of William and would be an intestate heir if William were to die immediately.

Respondent's interest in that proceeding was identical to his interest in the instant action—that is, he was adverse to William's attempt to disinherit him. Respondent could have opposed issuance of the substituted judgment on the same grounds raised in this case and established, as he did here, that William's June 18, 2001, July 3, 2001, and July 13, 2001 testamentary instruments were procured by appellant's undue influence. Had he done so, the probate court would not have ordered execution of the living trust and pour-over will by the conservator. And if respondent had successfully opposed issuance of the substituted judgment by relying on this same evidence, his victory would have served as an estoppel in any later litigation regarding the 2001 instruments.

 In addition, concerns for a testator's or trustor's health would seem to be common *personal* considerations in family probate disputes, which must be balanced by persons considering challenging a testator's planned testamentary disposition.[14] Respondent cites no authority for the contention that concern for a testator's health constitutes a disincentive to litigate for purposes of barring application of the collateral estoppel doctrine. This failure to cite pertinent legal authority is enough reason to reject the argument (*Balesteri v. Holler* (1978) 87 Cal.App.3d 717, 720 [151 Cal.Rptr. 229]; see

---

[14] We observe that respondent could have deferred to O'Keeffe's concerns regarding William's health by conditioning the abandonment of his objections to the petition on an agreement that the substituted judgment not act as a bar to future challenges.

also *People v. Foote* (2001) 91 Cal.App.4th Supp. 7, 12 [110 Cal.Rptr.2d 260]), and so we do. For the same reason, and for lack of evidentiary support in the record, we reject respondent's assertion that litigating the undue influence, fraud, and testamentary agreement issues in the substituted judgment proceeding would have been "financially prohibitive" for him.

### (2) Full and Fair Opportunity to Litigate

Respondent next contends he did not have a fair opportunity to litigate his claims in the substituted judgment proceeding because, as the trial court ruled in its statement of decision, respondent did not have access to the report of Nievod, who performed the neuropsychological evaluation of William, and the report of court investigator Jones. He also argues that, because substituted judgment proceedings are summary proceedings, evidentiary hearings are at the discretion of the probate judge. Finally, respondent argues that much of the key evidence of appellant's fraud and undue influence was subject to William's evidentiary privileges while he was still alive. Thus, he asserts that prior to William's death, the attorney-client and doctor-patient privileges would have prevented him from calling various material witnesses and that William's medical records would have been privileged as well.[15]

In certain circumstances, collateral estoppel will not be applied where the party against whom collateral estoppel is asserted offered evidence in the subsequent proceeding that he or she did not have the opportunity to present in the prior action. (See *Rodgers v. Sargent Controls & Aerospace* (2006) 136 Cal.App.4th 82, 95 [38 Cal.Rptr.3d 528].) However, we reject the notion that the evidence presented in the instant action could not have been presented in the substituted judgment proceeding.

First, the substituted judgment proceeding was summary only because respondent, who had notice of the substituted judgment petition, did not object to it. Had respondent pursued his objections, the court would have had the discretion to conduct an evidentiary hearing. (*McElroy, supra*, 104 Cal.App.4th at pp. 553–554; see also § 1000 [rules of practice, including discovery procedures in civil actions, apply to proceedings under the Probate Code].)

Second, neither respondent nor the trial court cited authority for the conclusion that the reports of Nievod and Jones, contained within the probate court's confidential files, could not be obtained by respondent. As noted by

---

[15] Respondent provides no authority for his claim that these evidentiary privileges would apply in the substituted judgment suit filed by William. Therefore, we reject it. (*Balesteri v. Holler, supra*, 87 Cal.App.3d at p. 720; see also *People v. Foote, supra*, 91 Cal.App.4th at p. Supp. 12.)

appellant, section 1821, subdivision (a)(5), provides that the person petitioning for a conservator must submit supplemental information as to why the appointment of a conservator is required, and in particular, the inability of the proposed conservatee to substantially manage his or her own financial resources, or to resist fraud or undue influence. Section 1826, subdivision (n), provides that the confidential court investigator's report shall be made available only to parties, persons given notice of the petition who have requested the report or who have appeared in the proceedings, their attorneys, and the court. Respondent does not explain why these sections would not have authorized his access to the reports of Nievod and Jones.

Finally, neither the attorney-client nor the doctor-patient privileges had any bearing on respondent's testamentary agreement claim since none of the witnesses cited by respondent testified to that issue.

### D. *Public Policy Considerations*

 Respondent disputes whether giving the substituted judgment order collateral estoppel effect will promote judicial economy by eliminating the necessity for a second court to reconsider the issues regarding the living trust's validity and propriety, and by avoiding vexatious litigation and inconsistent judicial rulings on the issues. In particular, respondent argues there were no prior judgments on the issues raised in this action, and the trial court's conclusion that appellant unduly influenced William establishes that the instant action is not vexatious. These arguments lack merit. Respondent's contention that there were no prior judgments on the issues raised in this action is not a public policy argument; it is merely an argument directed at the threshold factors underlying the collateral estoppel doctrine that we have already rejected. Moreover, collateral estoppel may apply even where the issue was wrongly decided in the first action. " ' "An erroneous judgment is as conclusive as a correct one." ' [Citation.]" (*Roos v. Red* (2005) 130 Cal.App.4th 870, 887 [30 Cal.Rptr.3d 446].) We conclude that the integrity of the judicial system would be served, judicial economy promoted, and vexatious litigation avoided by giving collateral estoppel effect to the substituted judgment order. Application of collateral estoppel in this case would give credit to the implied findings made by the probate court, acting within the scope of its jurisdiction, and in a forum where the parties were afforded a fair and full opportunity to present their evidence and arguments, and where appellate review of adverse rulings was available. (See *id.* at p. 888.)

Finally, respondent contends that the probate court's substituted judgment order had no effect other than to authorize the conservator to execute the

living trust and will as requested in the substituted judgment petition. He argues that it would violate public policy as well as the limited purpose of the substituted judgment statute to allow the substituted judgment order to shield appellant from liability in the instant action. As we stated previously, substituted judgment provisions are designed "to protect the conservatorship estate for the benefit not only of the persons who will ultimately receive it from the conservatee or his or her personal representative but also (and perhaps primarily) of the conservatee himself or herself." (*Hart, supra,* 228 Cal.App.3d at p. 1253.) "[S]ection 2580 provides for an order which authorizes or requires the conservator to take a proposed action for the purpose of (1) benefiting the conservat[ee] or the estate; (2) minimizing current or prospective taxes; or (3) providing gifts to persons or charities which would be likely beneficiaries of gifts from the conservatee." (*McElroy, supra,* 104 Cal.App.4th at p. 552.) The substituted judgment statutory scheme gives the court discretion and flexibility to consider the circumstances of each case. (*Hart,* at p. 1252.) That discretion and authority includes creating trusts and making wills. (§ 2580, subd. (b)(5), (13).) Respondent had ample opportunity in the probate court or in an appeal from the substituted judgment order to oppose the probate court's order on the grounds that the living trust was procured by fraud and undue influence or that a binding testamentary agreement existed. We see nothing in the substituted judgment statutory scheme that should protect respondent from being collaterally estopped from raising the identical issues in the instant action.[16]

We thus conclude the trial court erred in concluding that the instant action was not barred by collateral estoppel.

---

[16] Three days before oral argument, respondent submitted an unsolicited letter brief raising California Rules of Court, rule 7.903(c)(1), which bars "no-contest" clauses from trusts approved in the substituted judgment procedure, absent good cause shown. Respondent argues we should infer from this rule a "Legislat[ive]" intent that such trusts be "subject to contest after the death of the settlor, and that the substituted judgment statute would not act to collaterally estop subsequent attacks on the [living] trust." Because respondent failed to raise this argument before the trial court or in his briefing to this court, it is "doubly waived." (*Lambert v. Carneghi* (2008) 158 Cal.App.4th 1120, 1135 [70 Cal.Rptr.3d 626].) In any event, the argument lacks merit. Arguing that barring "no-contest" clauses impliedly bars the collateral estoppel doctrine is a non sequitur. Such a clause is "a provision in an otherwise valid instrument that, if enforced, would penalize a beneficiary if the beneficiary files" an action alleging the invalidity of a will or any of its clauses. (§ 21300, subd. (d).) Of course such a clause would have no effect on one in respondent's position, since he had already been disinherited. The rules on collateral estoppel were discussed, *ante.* In challenges to testamentary dispositions, the doctrine applies only to those beneficiaries, like respondent, who are parties to a proceeding and who seek to raise certain issues resolved against them in an earlier proceeding. Further, where collateral estoppel operates it does not penalize a beneficiary by stripping him or her of any benefits conveyed by a will.

## DISPOSITION

The judgment is reversed. Appellant shall be awarded costs on appeal.

Jones, P. J., and Stevens, J.,* concurred.

A petition for a rehearing was denied July 22, 2008, and the opinion was modified to read as printed above. Respondent's petition for review by the Supreme Court was denied September 10, 2008, S165651.

---

*Retired Associate Justice of the Court of Appeal, First District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.